**HESS, Inc., Libellant,**

v.

**Tanker, THE ARIZONA, Perseveranza Societa de Navigazione, Claimant and Claimant-Impleaded, THE Tug CAROL MORAN, THE Tug JOSEPH H. MORAN, Inc., Claimant and Claimant-Impleaded, THE Tug SHEILA MORAN, THE Tug EDMOND J. MORAN, Inc., Claimant and Claimant-Impleaded, Moran Towing & Transportation Co., Inc., Respondent and Respondent-Impleaded.**

**PERSEVERANZA SOCIETA DE NAVIGAZIONE, owner of the Tanker THE ARIZONA, Libellant,**

v.

**THE Tugs CAROL MORAN and THE SHEILA MORAN their respective engines, tackle, apparel, etc., Moran Towing & Transportation Co., Inc. and Hess, Inc., Respondent.**

United States District Court
S. D. New York.
Dec. 12, 1955.

Bigham, Englar, Jones & Houston, New York City, for libellant-respondent, Hess, Inc., Charles A. Van Hagen, Jr., New York City, of counsel.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for libellant, Perseveranza Societa de Navigazione, George B. Warburton, William R. Vincent, New York City, of counsel.

Burlingham, Hupper & Kennedy, New York City, for Moran Towing & Transportation Co., respondents, Adrian J. O'Kane, H. Barton Williams, New York City, of counsel.

Herbert P. Reid, New York City, for respondent Perseveranza Societa de Navigazione.

CLANCY, Chief Judge.

The decisive finding in this case is the determination whether or not the Arizona's own backing motion brought her stern to the area below the south end of the Hess pier where the December chart showed shallow water. The best witness of the Arizona's movement would be the only man looking at her—the man on the dock, Otterson, the Hess employee. His testimony is that when he first saw the vessel she was 400 feet off the pier and aligned with the dock in the normal position for a vessel attempting to dock there. With a form scaled to the chart, he traced the Arizona's position at that moment. The stern was about 40 or 50 feet north of the dock's south end. It was in that position that he first noticed the swing of the bow beginning. He walked 200 feet toward the Kill and by the time he had arrived at the face of the pier the Arizona's bow was 200 feet off the piles and the stern had moved south he thought about 25 feet as fixed by his second tracing. Probably it had not moved at all for everyone aboard knew then that the vessel was aground—the

bow tug was backing on her line, the stern tug was going around to the port side, and the Arizona's engines were at full speed ahead. It appears therefore that the Arizona was grounded in the area shown on the chart to be navigable and the position drawn by Otterson agrees generally with all the testimony about the place of contact of the Arizona's bow with the piles. What happened thereafter was beyond anyone's control. It appears probable to the Court that when consideration is given to the mud bottom that everyone assumed, the scant difference in depth, if the February chart is accepted, between the Arizona and the bottom when she first stranded, the effort of her propeller to move her forward, her weight and the force of her impact upon the piles, that the piles when struck acted as a fulcrum about which the momentum of the Arizona operated to cast her stern further west and that it slid west and south where it met the depth of 28 feet sounded by the captain. This would explain her southerly movement from the piles and the movement of the whole vessel noticed by Otterson. The argument of the water's depth from the chart made after the collision need not be pursued. Why the December chart was in error we do not have to say for the fact of error is established by the event and the error makes the chart of the whole southerly end of the area unreliable.

Perseveranza complains that the decision of the Moran Towing Company to land the Arizona in the conditions of tide, wind and water that obtained there at 4 o'clock was rash. Moran did face the apparently formidable task of docking a vessel 523.5 feet long in tidal waters only 650 feet long. Consideration was needed of the strength of the tide and of the wind. There was no evidence that any wind blew during the docking operation that was a factor in the result. There is no credible evidence that would indicate any insufficiency of the two Moran tugs to control the Arizona in the tide then running and the difference in their registered horsepower never caused any unevenness in the movement of the Arizona toward the dock while she was free. As to the depth, Moran was relieved of doubt by the chart published by the wharfinger consignee. The Court knows of no reason why the tug company and its captains should not have accepted it. It showed ample depth even for the Arizona's stern in all of the waters to be traversed. It rendered completely out of date the reputation of the dock as a highwater job for it was the invitation of the wharfinger and consignee to land a vessel of the Arizona's depth at any state of the tide. Therefore Moran was not negligent in making its decision nor was its captain negligent thereafter while the employee of the Arizona in his navigation of the Arizona. The docking operation was conducted according to common practice and the findings acquit him of error or miscalculation, so neither Perseveranza nor its vessel was negligent.

### Findings of Fact.

1. About 3 o'clock in the afternoon of February 1, 1952, the tanker Arizona, 523.5 feet long and 68.2 feet beam, with a 30.1 foot draft at her stern, left quarantine anchorage bound for the dock of Hess, Inc. at Perth Amboy on the west side of the Arthur Kill. Just above the Outerbridge Crossing a tug captain employee of respondent Moran took over control. She proceeded north slowly in the Kill to a point opposite the Hess dock which she reached about 4 o'clock. The ebb tide of a knot and a half had two hours to run and the surface water was about a foot and a quarter above mean low tide.

2. Two months earlier Hess had prepared a chart purporting to show that the water in the area in front of the Hess dock, extending approximately 500 feet to the West side of the Arthur Kill Channel and through the 500 feet of the dock's length and 150 feet further to the north, was everywhere 31 feet deep at mean low tide. The bottom depths below mean low water represented on this chart were spotted approximately 25 feet apart. There had been a dredging operation off

the Hess pier in the latter half of 1951 that had been noticed by tug pilots. The chart, which represented "soundings after dredging" was sent by Hess to towing concerns including the Moran Company. The chart showed the existence of considerably shallower depths in the area south of the Hess pier, and more than 150 feet north of its north end. East of the south end of the Hess dock at the western edge of the Arthur Kill Channel, there was a can buoy marking a rocky shoal.

3. The captain assigned by Moran to take charge of the docking of the Arizona was instructed by his office about noon on that day to bring her to the Hess pier that afternoon. He told his office that it was a job that should be performed at slack high water. The office, however, recalled to him that Hess, Inc. had on December 10, 1951, sent its chart of the soundings in front of the Hess dock and reminded him that he had a copy of the chart aboard. The captain examined the chart and was familiar with the soundings marked on it and proceeded to his task. He had two Moran tugs, the Sheila Moran, a tug of 750 horsepower, which, opposite the Hess dock, took its place at the starboard stern quarter and the Carol Moran, a tug of 1250 horsepower, at the starboard bow.

4. After the Arizona arrived at a point in the channel north of the can buoy and approximately opposite the Hess dock, she was brought to a dead stop in a position parallel to the channel and to the dock. The Moran captain in charge of the docking operation thereupon went astern on the Arizona's engine to get the stern west or inside of the can buoy. When her engines were stopped she was under control and lying in a position parallel to the dock. Almost immediately after, with the tugs pushing her broadside, the stern of the Arizona grounded on a shoal about 150 feet west of the can buoy and 150 feet north of the dock's end. The Carol Moran was pushing against the starboard bow and the grounding of the stern caused the vessel to acquire a swing to the dock.

The swing continued though her engine was put full speed ahead on a hard right rudder, the Carol Moran backed and finally both anchors were dropped. Control was not regained for her stern was not freed from the bottom. The Arizona's bow came into contact with a cluster of piles at the dock and then with the dock south of the piles, causing considerable damage to the Arizona as well as to the Hess piles.

5. Within a few days after the collision, Hess had new soundings taken on the approach to its dock by the same engineer who had taken the original soundings. He prepared a new chart dated February 5–7, 1952, which showed the existence of a number of changes in the depths charted within an area extending about 300 feet from the face of the dock, about 100 feet north of the dock's southerly end, and eastward to a point about 150 feet west of the can buoy, or to the approximate spot where the stern of the Arizona first went aground. Within this area, where the December chart showed almost everywhere over 32 feet, the new soundings disclosed depths shallower than 30 and in one spot as little as 28.5 feet. The December Hess chart did not present an accurate picture of the water depths in the area in front of its dock on February 1.

6. Hess, Inc. was the consignee of the cargo of oil laden aboard the Arizona as well as wharfinger. A clause in the charter party made part of the bill of lading by its terms, provides that the vessel shall discharge at a dock, "where she can always lie afloat."

7. The representations of the water depths in the December Hess chart were false in fact and conveying them to Moran who relied on them was negligent misrepresentation. To the knowledge of Hess—it being common knowledge to all shippers by sea—the Arizona would rely on Moran's advice as to the availability of the Hess dock. The Arizona did properly so rely on Moran's advice. So the Hess misrepresentation was negligent with respect to the Arizona. Such negligent misrepresentation to

both respondents was the sole cause of the damage to the Arizona.

8. The decision of Moran Towing Company and of its tug captain to dock the Arizona at 4 P.M. on February 1, 1952 was reasonable and not negligent.

9. The Moran tugs, respondents Sheila Moran and Carol Moran, obeyed the orders given to them promptly and were in no respect negligent.

10. The towage contract contained a pilotage clause. The Moran captain in charge of, and while she was docking an employee of, the Arizona, was not negligent in any respect. Therefore there is no negligence attributable to the Arizona.

### Conclusions of Law.

1. The libel of Hess, Inc. is dismissed with costs to all respondents. Judgment is granted Perseveranza Societa de Navigazione on its libel against respondent Hess, Inc. with costs and the libel is dismissed as against the Moran Towing & Transportation Co., Inc. with costs and as against the tugs without costs.