Elbert HOGGE

v.

SS YORKMAR, etc., et al.

CALMAR STEAMSHIP CORPORATION, Third-Party Plaintiff,

v.

UNITED STATES of America, Third-Party Defendant.

BETHLEHEM STEEL CORPORATION et al., Third-Party Plaintiffs,

v.

George C. BAKER et al., Third-Party Defendants.

CALMAR STEAMSHIP CORPORATION et al.

v.

UNITED STATES of America, Defendant and Counter-Claimant.

UNITED STATES of America

v.

CALMAR STEAMSHIP CORPORATION et al., Plaintiffs and Counter-Defendants.

BETHLEHEM STEEL CORPORATION et al.

v.

George C. BAKER et al., Third-Party Defendants.

Jacqi D. BRAZIL, etc.

v.

CALMAR STEAMSHIP CORPORATION.

CALMAR STEAMSHIP CORPORATION, Defendant and Third-Party Plaintiff,

v.

UNITED STATES of America et al., Third-Party Defendants.

Complaint of Bethlehem Steel Corporation, etc., et al.

BETHLEHEM STEEL CORPORATION et al., Cross-Claim Plaintiffs,

v.

George P. BAKER et al., Cross-Claim Defendants.

Civ. Nos. 73–233–Y, 73–241–Y, 73–750–Y and 73–761–Y.

United States District Court, D. Maryland.

March 11, 1977.

David R. Owen, and William R. Dorsey, III, Baltimore, Md., for Bethlehem Steel Corp.

Paul D. Bekman, Baltimore, Md., for Hogge and Brazil.

George E. Clements, Baltimore, Md., for Sanders.

William A. Grimes, George W. Constable, and James W. Constable, Baltimore, Md., for Penn Central Transportation Co.

Richard S. Wright, Baltimore, Md., for Berg Boat Co.

David V. Hutchinson, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for United States.

MEMORANDUM OPINION

JOSEPH H. YOUNG, District Judge.

On February 2, 1973 the SS YORKMAR, a vessel owned by Bethlehem Steel Corporation and operated under charter by Calmar Steamship Corporation, while transiting the Chesapeake and Delaware Canal struck the vertical lift span of a railroad bridge causing extensive damage to the bridge, the vessel, and resulted in the death of a seaman aboard the SS YORKMAR, Philip J. Brazil, and alleged personal injuries to YORKMAR seamen Elbert Hogge and Gary Sanders. As the result of this incident numerous proceedings have been instituted. A summary of the parties and the status of these proceedings follows:

A. *In the Matter of the Complaint of Bethlehem Steel Corporation, as Owner, and Calmar Steamship Corporation, as Bare Boat Charterer, Operator and Owner pro hac vice of the SS YORKMAR, for Exoneration From or Limitation of Liability, Civil Action No. 73-761-Y*

This proceeding was instituted by Bethlehem Steel Corporation, as owner, and Calmar Steamship Corporation as Bare Boat Charterer, operator, and owner *pro hac vice* of the SS YORKMAR, pursuant to supplemental Rule F of the Federal Rules of Civil Procedure, seeking exoneration or limitation of liability from all claims arising out of the allision between the SS YORKMAR and the Penn Central Bridge. In this proceeding the following have filed claims pursuant to the Order of this Court dated August 1, 1973:

(a) Jacqi D. Brazil, as surviving widow of Philip J. Brazil, and mother and next friend of Philip R. Brazil and Randy M. Brazil, surviving children, and as the executrix of the estate of Philip J. Brazil, deceased, claiming damages as the result of the death of Seaman Philip J. Brazil.

(b) Elbert Hogge, a seaman aboard the SS YORKMAR, claiming damages for alleged personal injuries.

(c) Gary Richard Sanders and Peter Dolan, seamen aboard the SS YORKMAR,

claiming damages for alleged personal injuries.

(d) Berg Boat Company, as owner of the tug "SQUAREHEAD" and the barge "POLLY ESTER," claiming damages as the result of the closure of the canal.

(e) Trustees of the property of the Penn Central Transportation Company, claiming damages as the result of the incident for costs of rerouting and detouring railroad traffic, lost revenue, extra per diem costs for delay in the movement of cars, lost demurrage, extra operation and engineering costs and expenses, and other costs not yet ascertained.

(f) United States of America, claiming damages by virtue of the fact that it repaired the railroad bridge.

In these same proceedings Bethlehem Steel Corporation and Calmar Steamship Corporation have filed a cross claim against the Trustees of the Property of the Penn Central Transportation Company, alleging that the accident was the fault of the Penn Central Transportation Company and seeking indemnity and/or contribution with respect to the claims of Jacqi Brazil, Elbert Hogge, Gary Sanders, the Berg Boat Company and the United States of America, as set out above.

B. *Jacqi D. Brazil, Executrix of the Estate of Philip J. Brazil, Deceased, Plaintiff v. Calmar Steamship Corporation, Defendant and Third-Party Plaintiff v. United States of America and Trustees of the Property of Penn Central Transportation Company, Third-Party Defendants, Civil Action No. 73–750–Y*

This action was originally filed in the United States District Court of Washington, Western District, and transferred to the United States District Court for the District of Maryland by order of the United States District Court for the Western District of Washington, entered on July 20, 1973. The suit alleges that the deceased was a member of the crew of the SS YORKMAR, that his death was caused when the SS YORKMAR struck the railroad bridge span, and seeks judgment against the Calmar Steamship Corporation in such sum as will compensate the surviving widow for damages allegedly sustained by reason of the deceased's allegedly wrongful death. Calmar has filed third-party complaints against both the United States of America and the Trustees of the Property of the Penn Central Transportation Company, and pursuant to Rule 14(c), Federal Rules of Civil Procedure, has made the plaintiff, Jacqi D. Brazil, the plaintiff against the third-party defendants, United States of America and the Trustees of the Property of the Penn Central Transportation Company, tendering the defense of the case under that rule, and seeking indemnity and/or contribution for any judgment entered against it with attorneys' fees, court costs, and expenses. This litigation is subject to the Order of this Court dated August 1, 1973 in the limitation proceeding, referred to above, enjoining the prosecution of any suits, actions or claims against Bethlehem Steel Corporation, Calmar Steamship Corporation and the SS YORKMAR, save in the limitation proceeding.

C. *Elbert Hogge, Plaintiff v. Bethlehem Steel Corporation, Calmar Steamship Corporation, and the SS YORKMAR, Defendants; Calmar Steamship Corporation, Third-Party Plaintiff v. The United States of America, Third-Party Defendant; Bethlehem Steel Corporation and Calmar Steamship Corporation, Third-Party Plaintiffs v. Trustees of the Property of Penn Central Transportation Company, Third-Party Defendant, Civil Action No. 73–233–Y*

In this action, Elbert Hogge, a seaman aboard the SS YORKMAR, brought suit against the SS YORKMAR and Bethlehem Steel Corporation and Calmar Steamship Corporation for injuries allegedly sustained in the accident. Calmar filed a third-party complaint against the United States of America and, under Rule 14(c), Federal Rules of Civil Procedure, made the plaintiff Elbert Hogge, a plaintiff against the third-

party defendant and tendered the defense of the case to the United States of America and also sought judgment for indemnity for any judgment that may be entered in favor of Hogge with interest, counsel fees and costs. Bethlehem Steel Corporation and Calmar Steamship Corporation have also filed a third-party complaint against the Trustees of the Property of the Penn Central Transportation Company and have made the plaintiff, Elbert Hogge, a plaintiff against the Trustees of the Property of the Penn Central Transportation Company and tendered the defense of the action to the Trustees of the Property of the Penn Central Transportation Company and sought judgment for indemnity and/or contribution in its favor against said Trustees for any judgment that might be entered against them in favor of Hogge. This litigation is subject to the Order entered in the limitation proceedings on August 1, 1973 enjoining the prosecution of any further suits, actions, claims or counter-claims against Calmar Steamship Corporation, Bethlehem Steel Corporation and the SS YORKMAR.

D. *Calmar Steamship Corporation, Plaintiff v. United States of America, Defendant; United States of America, Counterclaim Plaintiff v. Calmar Steamship Corporation and SS YORKMAR, in rem, Counterclaim Defendants; Calmar Steamship Corporation and Bethlehem Steel Corporation, Third-Party Plaintiffs v. Trustees of the Property of the Penn Central Transportation Company, Third-Party Defendant, Civil Action No. 73–241–Y*

This suit was instituted by Calmar Steamship Corporation against United States of America, claiming damages for the injury done to the SS YORKMAR and seeking indemnity and/or contribution for any damages paid in the satisfaction of claims or suits filed against it as the result of the accident. In its answer, the United States of America counterclaimed for its damages and joined the SS YORKMAR as an additional party. Subsequently, the

Trustees of the Property of the Penn Central Transportation Company sought leave to intervene against both the United States of America and Calmar Steamship Corporation as intervening plaintiff. The motion was granted with respect to the United States, but denied with respect to Calmar Steamship Corporation because of the injunction entered in connection with the limitation proceeding referred to above. Accordingly, this action also encompasses a claim by the Trustees of the Property of the Penn Central Transportation Company for its damages against the United States of America and a counterclaim by the United States against the Penn Central Transportation Company. In addition, Calmar Steamship Corporation has filed a third-party complaint against the Trustees of the Property of the Penn Central Transportation Company with respect to the counterclaim of the United States of America filed against it in this action.

The three-week evidentiary trial was primarily for the taking of evidence in the limitation proceedings, but by stipulation and agreement of counsel, it was agreed that the rights and liabilities of all of the various parties and claimants *inter sese* were to be determined by the proofs adduced at the evidentiary trial. Proof of damages and questions concerning the evaluation of the limitation fund, if necessary, have been deferred until determination of the rights of the various parties as provided for herein. The detailed pleadings in this case were made even more detailed by the filing of certain amendments and additions to the pleadings which were made a part of the pretrial order, filed immediately prior to trial. The pleadings were amended to include the following:

1. Wherever Calmar Steamship Corporation filed a complaint, cross-claim or third-party complaint Bethlehem Steel Corporation is deemed a party plaintiff, cross-claim plaintiff or third-party plaintiff to the same extent as Calmar Steamship Corporation. Where Calmar Steamship Corporation is a party defendant or cross-claim defendant, Bethlehem Steel Corporation

and the SS YORKMAR are deemed a party defendant or cross-claim defendants. Bethlehem Steel Corporation shall have no greater rights or liabilities for purposes of this litigation than Calmar Steamship Corporation.

2. Paragraph 10 of the complaint in Civil Action No. 73–241–Y is deemed to include the claims of the Trustees of the Property of the Penn Central Transportation Company, Gary Sanders and Berg Boat Company. The defendant denies liability for said claims.

3. The claim of Jacqi D. Brazil, individually and as administrator of the estate of Philip J. Brazil and of Randy M. Brazil and Philip R. Brazil, surviving children of Philip J. Brazil, includes an *in rem* cause of action against the SS YORKMAR, her engines, boilers, tackles, apparel, etc., to the same extent as though the case of *Jacqi D. Brazil, et al. v. Calmar Steamship Corporation, et al.,* Civil Action No. 73–750–Y, had been amended to set forth such an *in rem* cause of action. No physical attachment of the SS YORKMAR, now known as YORKMA-RU, is necessary for the *in rem* cause of action to come into existence.

4. In Civil Action No. 73–761–Y the claimant United States of America amends its claims to include a second cause of action against Calmar based on a violation of 33 U.S.C. § 403. The second cause of action is denied by the plaintiff Calmar.

5. In Civil Action No. 73–241–Y the defendant United States of America amends its answer and counterclaim to Penn Central's complaint to include a cross-claim against Calmar pursuant to Rule 14(c), Federal Rules of Civil Procedure, tendering the defense to Calmar and seeking indemnity and contributions from Calmar.

6. The claim and answer of Penn Central in Civil Action No. 73–761–Y is amended to add a new Paragraph 8 demanding from Bethlehem Steel Corporation and Calmar Steamship Corporation indemnification and/or contribution by Bethlehem and Calmar in such amounts as will reimburse Penn Central for any damages paid in satisfaction of claims, suits or actions arising from the incident involved in that complaint.

7. Penn Central Transportation Company and Bethlehem Steel Corporation and Calmar Steamship Corporation stipulate that each crossclaims against the other for indemnity and/or contribution for claims arising out of the allision and each denies the cross-claims of the other, to the same effect as if each had filed formal cross-claims and answers thereto, but without the necessity of such filing.

8. Penn Central Transportation Company and the United States of America stipulate that each crossclaims against the other for indemnity and/or contribution for claims arising out of the allision, and each denies the cross-claims of the other to the same effect as if each had filed formal cross-claims and answers thereto, but without the necessity for such filing.

9. United States of America and Bethlehem Steel Corporation and Calmar Steamship Corporation stipulate that each cross-claims against the other for indemnity and/or contributions for claims arising out of the allision, and each denies the cross-claims of the other to the same effect as if each had filed formal cross-claims and answers thereto, without the necessity of so filing.

10. The personal injury claim of Peter Dolan, a seaman aboard the SS YORK-MAR, was stipulated to be a late claim, with a fair and reasonable value of $300.00.

Although the basic facts upon which liability must ultimately rest in this case are in dispute by the parties, certain facts have been stipulated. They are as follows:

1. At all times pertinent, the SS YORK-MAR was a United States flag vessel which was owned by Bethlehem Steel Corporation, and which was bare boat chartered to Calmar Steamship Corporation, its operator and owner *pro hac vice.* The SS YORK-MAR had a length overall of 522 feet 10½ inches, a beam of 71 feet 6 inches and a molded depth of 43 feet 6 inches. Her deadweight tonnage is 15,042 tons, her gross tonnage is 11,421.87 tons and her net

registered tonnage is 7,636 tons. The Chesapeake and Delaware Canal is an interstate waterway which forms a part of the navigable waters of the United States. It is operated and maintained by the United States Government through the United States Army Corps of Engineers.

2. The Penn Central Transportation Company is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. It is the owner of a bridge with a vertical lift span located near Summit, Delaware, over the Chesapeake and Delaware Canal. The bridge is operated by bridge tenders who are employees of the Penn Central Transportation Company.

3. Pursuant to the provisions of Section 7 of the Rivers and Harbors Act of 1917, 33 U.S.C.A. § 1, the Secretary of the Army, on May 2, 1972, duly prescribed Regulations for the use, administration and navigation of the Canal. Such Regulations became effective and acquired the force of law and were published as 33 C.F.R. 207.100. Said Regulations were supplemented by rules dated December 22, 1972, duly issued by the Corps, through its acting District Engineer, Philadelphia District, effective January 1, 1973. Such rules were published to mariners using the Canal by Local Notice to Mariners No. 3, dated January 16, 1973, issued by the Commander, Fifth Coast Guard District.

4. February 2, 1973, the SS YORKMAR under enrollment and license was enroute from Port Newark, New Jersey, to Baltimore, Maryland, when she struck the movable span of the Penn Central Railroad Bridge (hereinafter referred to as the "Bridge"), which spans the Chesapeake and Delaware Canal (hereinafter referred to as the "Canal") at Summit, Delaware.

5. The Bridge is the only variable height (vertical lift) bridge that spans the Canal, and it has the clearance of approximately 45 feet in the lowered position and approximately 135 feet in the raised position.

At the time the YORKMAR struck the Bridge her master was Benjamin Edelheit, and her pilot was John K. Sundling.

6. It is stipulated that at the time of the accident, Gary Sanders, Elbert Hogge, Philip J. Brazil and Peter Dolan were seamen aboard the SS YORKMAR, and employed by the Calmar Steamship Corporation. Gary Sanders was employed as third assistant engineer, Elbert Hogge as bosun, and Philip J. Brazil and Peter Dolan were employed as able-bodied seamen.

The allision of February 2, 1973—resulting from the YORKMAR striking the Bridge, a stationary object—was the forerunner of a later collision—the violent encounter of the theories of liability put forth by the parties to this litigation.

The YORKMAR weighed anchor in Port Newark, New Jersey, at approximately 2330 hours on February 1, 1973, under the control of John Sundling, her pilot. Every port and inland waterway has its own peculiar problems and a pilot is utilized because he is more familiar with the local problems. Although the pilot has responsibility of navigation while he is on the bridge, full responsibility remains with the captain who must see that the vessel is seaworthy at all times. Sundling first received a license as a pilot in 1958 and has been serving as a pilot in various waters in northeastern United States and Texas since that time. In his career he has traversed the Canal approximately 1000 times, 200 to 300 times as a pilot, and averaged two trips per month from 1971 to 1973. Sundling had had prior acquaintance with the YORKMAR, having served as pilot on several previous occasions. During the trip from New York Harbor on February 1 and the early hours of February 2 he operated the ship's channel 13 radio but only to transmit messages; having received no messages during that period of time. After passing Ambrose Light, Sundling turned the ship over to Benjamin Edelheit, her master, who was in charge until the ship approached the Delaware Bay at which time Sundling resumed the pilot's position on February 1, 1973 at approximately 2000 hours. The approach to the Canal requires traversing the Delaware Bay which is connected to the Chesapeake Bay by the Canal. The YORKMAR contacted the Delaware River pilot without

difficulty and had no radio problems while entering the Delaware Bay.

An amazing lack of organization controls the operation of the Canal. This lack of direction has allowed a hit-or-miss procedure of contacting the dispatcher which seems to vary from pilot to pilot. There is no specific location or time at which the ships are required to make their first contact with the canal dispatcher. Prior to January, 1972, the system provided that a call was to be made by a vessel to a patrol boat who then called the dispatcher and the patrol boat relayed messages to the vessel, acting as an intermediary between the vessel and the dispatcher. There was no direct contact between the vessel and the dispatcher. When a vessel was approximately 2000 feet from the Canal entrance the patrol boat would notify the dispatcher that the vessel had entered the Canal. The vessel did not report to the dispatcher although it could communicate with the dispatcher while traversing the Canal. This system was changed when television cameras were installed in January, 1972. The dispatcher has the obligation of giving clearance to vessels entering the Canal and of keeping check on the vessels at different points while traversing the Canal, and of advising them of the presence of dredges, boats, derricks and other traffic in the Canal. However, it is quite clear that the dispatcher did not generally know whether the Bridge was up or down at any particular time, and it is equally clear that the bridge tender did not advise the dispatcher when the Bridge was raised or lowered. The dispatcher did not have a railroad schedule and did not make any effort to determine the condition of the Bridge. The dispatcher explains that the condition of the Bridge was a matter between the railroad and the vessel and not the responsibility of the dispatcher.

The dispatcher also has the responsibility of determining when weather conditions, or other conditions, require that the Canal be closed. This was usually done when visibility was less than one-half mile at any point in the Canal. The dispatcher did not have a practice of advising the bridge tender when the Canal was closed, but only made such information available to the ships that had been cleared to traverse the Canal and to those actually in the Canal when it was closed. The procedures followed in operating the Canal were perhaps best expressed by Bernard W. Schwartz, a supervising civil engineer with the Corps of Engineers who had been in charge of the dispatchers and operations of the Canal since June, 1972. He assumed this position without having had any prior training or instructions for the operation of the Canal and received his training by overlapping with his predecessor one and one-half days and by reading the available material and a job description. It was not his practice to discuss safety procedures with the dispatchers, nor to discuss anything with them and he never really checked out the system or procedures.

Schwartz did not consider the dispatchers to have the responsibility for the safe passage of vessels through the Canal except under limitations set forth in the Regulations of the Canal which require reports as to the width and length limitations of the vessels and the requirement that the vessels obtain clearance prior to entering the Canal. The dispatcher is considered to be responsible for the safety of vessel traffic but this is not considered synonymous with safety of the vessel itself, the latter considered the responsibility of the master of the vessel. Although the supervisor admitted that the Bridge is a potential hazard to traffic, he said that the dispatcher is not required to notify vessels of the position of the Bridge. Nor did the office of the dispatcher make an effort to inquire as to the position of the Bridge at any particular time. If the Bridge was in the down position, the dispatcher had the obligation to pass that information to the vessels in the Canal, but it was not the practice to seek out information on the Bridge, relying upon the tender to make that information available. Established procedure was borne out by the testimony of Harry J. Longacre, employed by the Corps of Engineers as dispatcher for approximately four and one-half years. He admitted there was no stan-

dard procedure for granting clearance to vessels entering the Canal, with each individual dispatcher exercising his own procedure. In his own experience the ship would normally call and the pilot would be told to bring the ship in. This was considered clearance to enter the Canal but the word "clearance" was not always used. Longacre further indicated that he would not give clearance to a vessel at anchor by advising that vessel to follow a particular vessel in the Canal. If it was at anchor he would not consider instructions to follow a certain vessel as clearance but would expect the vessel to check in after it got underway, and after getting the time the vessel got underway he would then get clearance to enter the Canal.

This overall policy of operation of the Canal was also referred to by Louis Caccese who has been employed for 20 years as chief of operations of the Philadelphia Division of the Corps of Engineers and is responsible for the operation of the Chesapeake and Delaware Canal. Approximately 15,000 to 20,000 vessels traverse the Canal annually to take advantage of the reduced travel time between Philadelphia and Baltimore and Baltimore and the North Atlantic ports. Caccese suggested that the shipping industry is the beneficiary of the Canal and improvements over the years have exceeded $100,000,000. New rules were prepared after consultation with the Pilots Association, the Coast Guard, the shipping industry and others. The only real responsibility placed upon the Corps of Engineers through these rules was the determination by the entering vessel of the width of other vessels going in the opposite direction. The Corps assists with this determination and the sole function of the dispatcher is to control the width of vessels in the Canal. Caccese thus suggests that the ships can take care of themselves in all other areas of operation. Although he admitted that it would have been possible to establish a ship check point or points and to have prescribed a clearance system before a vessel enters the Canal, this procedure was discarded in an attempt to keep the rules and regulations of the Canal simple. No one can quarrel with the Corps'

success on this point. The Corps also discussed the operation of the railroad bridge and decided the responsibility for the operation of the Bridge should be left to the railroads and the vessels, and suggested that the vessel has the responsibility of navigating the Canal safely. Caccese restated the position of the Corps of Engineers, that is that its only responsibility is to control the beams of the ships in the Canal and that it is the pilots' job to get the vessels through the Canal. The purpose of clearance is simply to control the width of the beam of the vessels and is for no other reason. Clearance to enter the Canal meant just that, and did not mean that the Bridge would be up or that there was any guarantee as to the position of the Bridge.

The procedures followed by the bridge tenders was testified to by Raymond L. Elliott and Leon N. Biggs. The Bridge has a horn on the top of the side pier which is hand operated and lights which operate continuously located on the four corners of the movable span. A red-over-green light in the center span, containing a 100 watt bulb, operates automatically and red and amber flashing lights are next to the red and green and operate when the span is in a lowered position. The span is normally in a raised position and is lowered only for heavy sleet, snow, maintenance or to allow the passing of trains. The bridge tenders obtain the time a ship enters the Canal from the dispatcher and the trains which operate over the Canal bridge operate on no fixed schedule. The entire process of raising and lowering the Bridge takes approximately 20 to 25 minutes. For this reason the tenders do not lower the Bridge if a vessel has just entered the Canal since there would be an insufficient amount of time to lower and raise the Bridge again before the vessel would arrive at the Bridge location. The tender keeps no record of the ships as they enter the Canal and if he knows that a ship is in the Canal, the tender calls the ship and then determines from its location whether to wait until it has passed or to request the vessel to slow its speed to enable the lowering and raising of the

Bridge. The horn on the Bridge has never been blown and the bridge tenders testified they had never heard three blasts from an approaching vessel and were not even aware of the requirement. It is the job of the tender to advise the vessel that the Bridge is down if he knows a vessel is in the Canal at that time. The tenders receive information from the dispatcher relating to ships in the Canal but receive no word of ships that have cleared or are at anchor prior to receiving clearance.

Against this varied background of rules and regulations the YORKMAR entered the web of the Chesapeake and Delaware Canal railroad bridge in the early hours of February 2, 1973.

After experiencing heavy wind and rain on approaching the entrance to the Canal the YORKMAR attempted, without success, to call the dispatcher at Chesapeake City. Her pilot, John Sundling, heard over the radio that the Canal was closed and decided to anchor at 0050 on February 2. Having been unsuccessful in attempting to contact the dispatcher, the pilot told Captain Edelheit of the radio difficulty and the radio operator was then called to attempt to contact other operators without success on any of the channels. Contrary to this testimony was the statement by Captain Edelheit that Sundling had called the canal dispatcher when approximately one-half hour from the Canal during the late hours of February 1 and was advised that the Canal was closed at that time. The decision was then made to go to anchor. It is apparent that Sundling used channel 13 for this communication. Whatever the sequence of events, it is apparent that the YORKMAR went to anchor at 0050 on February 2, 1973 because of fog conditions and weather problems, and at that time the channel 13 radio facility was inoperable. The captain and the pilot retired for the night and were called at 0630 on February 2, and informed that the dispatcher had announced that the Canal was open and had called the YORKMAR advising her to follow the fourth vessel into the Canal. Sundling informed the captain that the vessel could not enter the Canal without two-way radio communication but

that he would make an attempt to get clearance from the dispatcher by the land operator or the Wilmington marine operator.

The canal dispatcher was finally contacted through the Wilmington marine operator and Sundling is alleged to have said "YORKMAR calling, have UHF radio problem, can we get clearance, have channel 13 receiver." The dispatcher is alleged to have said, "Okay, follow other ships." Sundling then stated "Can't give a call as we enter breakwater, can we have an obstruction-free canal?" The dispatcher is alleged to have repeated his "Okay" and Sundling requested the dispatcher to call the YORKMAR if there were any problems. This conversation is alleged to have taken place on the morning of February 2 at 0645. Both Sundling and Edelheit considered the request for obstruction-free passage to mean safe passage through the Canal and assumed this assured that the Bridge would be maintained in a raised position during the course of the YORKMAR's traversing the Canal. Both admitted that although this was assumed to be clearance for safe passage it did not release the ship from taking its own precautions.

Meanwhile, back at Chesapeake City, Frank H. Briscoe reported to work at 0001 on February 2, scheduled to work until 0800. There were no set procedures followed when the dispatcher relieved the previous watch other than to receive information of any vessels that were in the Canal and whether or not the Canal was open or closed, and if clearance had been granted to any vessels. When he reported in the early hours of February 2 he was advised that the Canal was closed and that three ships were anchored at the northern end of the Canal—the SALVADOR, the BELGIAN and the ALMIRANTE STEWART. Briscoe then had a conversation with another vessel, the POTHITI, and then talked to the YORKMAR at 0300 on February 2. Briscoe corroborates Edelheit's testimony that the YORKMAR called on channel 13 and received word that the Canal was closed. At 0630 on February 2 Briscoe called the

bridge tender and reported good visibility after having checked the television monitor at Reedy Point. Having determined that the Canal should be opened, Briscoe changed the traffic light at Reedy Point from red to green and then called each of the ships lying an anchor individually, receiving no reply from the YORKMAR. The STEWART requested clearance at 0655 and the POTHITI requested clearance at 0717. Briscoe also received a call from the YORKMAR through the Wilmington operator between 0630 and 0700 at which time he was advised that the YORKMAR was having difficulty transmitting on channel 13. He requested the YORKMAR to use channel 16 or channel 18 and to follow the fourth ship in. Briscoe had no recollection that the YORKMAR made any request for information of obstacles and did not recall having given any clearance other than to say he had authorized the vessels awaiting entrance to enter the Canal which simply meant permission to get under way requiring each of them to call in at Reedy Point. Briscoe was relieved by Longacre at 0715 and at that time Briscoe advised the relief operator that no clearance had been given to the three vessels who had not then entered the Canal. He did mention the YORKMAR's radio problem and did not consider that he had authorized the YORKMAR to enter the Canal or that clearance to enter had been granted. Briscoe also testified that Sundling did not ask for clearance for the YORKMAR and that he did not ask to go through the Canal without further radio contact, nor did he ask to go through the Canal with the assurance that there were no obstacles.

With a background of these factual findings the Court now turns to a discussion of the law relating to allisions generally, and as applied to these facts, specifically.

## THE LAW OF COLLISIONS (AND ALLISIONS)

### A. *Generally*

▮ The basis for liability in collision cases is fault; the mere fact of impact has no legal consequences. *The Java*, 81 U.S. (14 Wall.) 189, 20 L.Ed. 834 (1872). The fault, of course, must not be merely fault in the abstract; rather it must be fault which is a contributing cause to the collision. *P. Dougherty Co. v. United States*, 207 F.2d 626 (3rd Cir. 1953), *cert. denied*, 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954). The existence of fault can be measured only against accepted standards of conduct. In American admiralty law, these standards are generally derived from the following sources:

1. The Statutory Rules of Navigation (in this case the rules for the inland waterway).

2. Other statutes and regulations having the force of law.

3. Proved local customs.

4. The requirements of seamanship and due care. Gilmore & Black, *The Law of Admiralty* (2nd Ed. 1975) § 7–3 (hereinafter "Gilmore & Black").

### B. *Division of Damages*

▮ Until recently the admiralty courts of the United States applied the rule of divided damages set out in *The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233. The rule provided that when two vessels collide and each is guilty of contributory fault (regardless of the relative degree of their fault) the total damage suffered by both vessels is evenly divided between them. This venerable rule has recently been reexamined and discarded by the Supreme Court in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The Court reviewed the history of the rule and indicated that, as originally formulated, it was an attempt to achieve rough justice when relative degrees of fault and causality were difficult to determine. The Court noted, however, that the rule is unnecessarily harsh and crude. Cases and commentators had remarked that a more sophisticated and equitable means of allocating damages was required. The Court concluded that the rule had prevailed through inertia rather than because of merit or its appeal

to reason. The rule no longer served the purpose enunciated for it in *The Schooner Catharine*—"the 'just and equitable' allocation of damages." *Reliable Transfer, supra* at 411, 95 S.Ct. at 1715. Accordingly, the Court rejected the divided damages rule and opted for the modern rule of comparative fault. The key language is as follows:

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

While the Court directly addresses only the question of property damage, it is clear that the same reasoning also requires the use of the comparative fault doctrine in cases of damage resulting from personal injury or death.

The questions which must be addressed to determine the liability of parties in this complicated case are, therefore, as follows:

## I. WHAT, IF ANY, IS THE RELATIVE DEGREE OF CONTRIBUTORY FAULT OF EACH PARTY?

A. The Penn Central Railroad

B. The United States

C. The YORKMAR

In addition, the parties may have certain defenses or limitations on their liabilities. These must also be considered.

## II. DEFENSES TO OR LIMITATIONS OF LIABILITY

A. The YORKMAR

1. Can Bethlehem/Calmar avail itself of the defense of compulsory pilotage?

2. Can Bethlehem/Calmar limit its liability under the Limitation of Liability Act?

B. The United States

Is the claim against the United States by Penn Central outside the admiralty jurisdiction of this Court?

It should also be noted that any parties found at fault are jointly and severally liable regardless of their percentage of fault.

## I. THE DEGREE OF FAULT

Before considering the relative degree of contributory fault of the defendants, it should be noted that those members of the crew who are parties to this litigation—Sanders, Hogge, Brazil and Dolan—are found to be free of any negligence contributing to the allision, or to their injuries or death.

### A. The Penn Central

The United States and Calmar have argued that Penn Central's fault in the instant allision consisted of its failure to take precautions other than those required by Coast Guard and Corps of Engineers regulations. Penn Central argues that its duties to shipping were exhausted by the regulatory requirements and that any additional precautions would not have failed to prevent the allision or would have resulted in even more confusion in an already complicated situation in the Canal.

Three basic issues are posed by the conflicting theories of the parties:

1. Was Penn Central's duty to the YORKMAR exhausted by its compliance with the rules for bridge operations promulgated by the Corps of Engineers and the Coast Guard?

2. Was the Penn Central justified in relying on the due care of the Corps of Engineers and the YORKMAR?

3. Were there any additional safety or warning devices which Penn Central should have used to avert the allision?

■ 1) Penn Central's position appears to be that its duties regarding the safe operation of the drawbridge were exhausted by its compliance with the applicable rules and customs. Under this theory, Penn Central would be at fault only if it failed to give the proper whistle signals required by

Coast Guard regulations, 33 C.F.R. § 117.-235(a), or if it failed to abide by the prevalent customs in the Canal regarding the use of channel 13. That Penn Central did not fail in either of these respects is not disputed. However, the United States and Calmar contend, and rightly so, that Penn Central's obligation to exercise due care was not exhausted by its compliance with these requirements. In *Oregon-Washington Bridge Co. v. The Lew Russell*, 196 F.2d 707 (9th Cir. 1952), the court faced this question in an allision case. In that case, a tug and its tow allided with a lift bridge because of an electrical failure on the bridge. The tug approached and the lift span was lifted electrically by the bridge tender. However, before the lift span reached its full height, the bridge (through no fault of its own) lost all its electrical power. The tender attempted to signal the tug via a flashing red light and an air whistle, but these also failed due to the lack of power. The Bridge Company argued that it had complied with all the warning device requirements issued by the War Department and so should not be held liable. The court rejected this argument and held that the bridge's duty of care was not exhausted by the compliance with the applicable regulations. Similar arguments were made and rejected in *Circle Line Sightseeing Yachts, Inc. v. City of New York*, 283 F.2d 811 (2nd Cir. 1960), and *Contino v. Baltimore & Annapolis Railroad Co.*, 178 F.2d 521 (4th Cir. 1949). The general proposition which can be derived from the cases is that a private party with custody of a hazardous instrumentality cannot be heard to say that its duty to use due care in the operation of the instrumentality and the use of warning devices is exhausted merely because it has complied with all applicable laws and regulations. Nor can it completely delegate its duties to some government agency with jurisdiction over, or responsibility for, the instrumentality.

■ 2) Despite this conclusion of law, Penn Central still has a good argument against its fault in the allision. Prior to the allision, both the YORKMAR and the Corps of Engineers had been guilty of relatively egregious fault. Therefore, the question

arises: Did the Penn Central have a duty to anticipate the negligent actions of the other two parties and to take appropriate corrective measures? The general tort rule on the question is that a person has a duty to anticipate the negligence of others if the probability of such negligence is relatively high, the magnitude of the harm which will result relatively great and the burden of exercising due care relatively slight. Prosser words the rule as follows:

> The duty to take precautions against the negligence of others thus becomes merely a matter of the customary process of multiplying the probability that such negligence will occur by the magnitude of the harm likely to result if it does, and weighing the result against the burden upon the defendant of exercising such care.

Prosser, *The Law of Torts*, page 172 (4th Ed. 1971).

■ Applying this rule to the instant case, it is clear that the magnitude of the harm which might result from a negligently caused allision is very great. However, the probability of such dereliction of duty as occurred here is very slight. The Railroad could scarcely have anticipated the existence in the Canal of a ship unknown to the dispatcher, which vessel was completely without (or which failed to use properly) its channel 13 receiver and transmitter and which failed to give either the customary radio signal to the bridge or the required whistle signal. The probability, then, of such compounding of fault upon fault is relatively low, much as it was in *Petition of Kinsman*, 338 F.2d 708 (2nd Cir. 1964), in which the court held that the bridge owner was not required to foresee extreme acts of negligence by others, although he was ultimately held liable under the Pennsylvania rule for violation of a statute requiring that the bridge be tended during certain hours.

3) The third issue posed by this Court's analysis blends neatly into the final factor that Prosser considers relevant. What measures could the Railroad have taken to avoid the disaster and what were their costs and chances of success?

a) The Corps and the YORKMAR suggest that a general broadcast signaling the closing of the bridge should have been made. The expedient would have been relatively cost-free, but it would have cluttered the already crowded channel 13. Furthermore, there is no great likelihood that the YORKMAR would have heard such a warning since it failed to hear other relevant comments on channel 13 which should have put it on notice of the Bridge's position.

b) Another suggestion is that warning lights should have been placed along the Canal indicating the position of the Bridge. Once again, in the instant case it is not at all clear that such lights would have helped, considering the poor visibility.

(c) Another suggestion is that the Bridge, when closed, should issue an intermittent whistle signal. Again it is doubtful that such a signal would have prevented the allision. It is clear that the train whistle went unheeded.

Considering the probability of the result, the magnitude of the harm if the result occurred, and the cost and effectiveness of possible additional warning devices, a prudent bridge owner might have been moved to install such a device or devices.

Considering the failure to do so by Penn Central as fault and the degree to which such fault was a proximate cause of the allision, and comparing that fault to the gross derelictions of the Corps and the YORKMAR, the Court finds the liability of the Penn Central Railroad to be 10%.

## B. *The Corps of Engineers*

The degree of fault of the Army Corps of Engineers clearly depends on the findings as to the content of the communication from the YORKMAR to Dispatcher Briscoe via the Wilmington Marine Operator. Both the Corps and the ship agree that the call was made at 0645 on February 2. However, these two parties disagree radically as to the content of the conversation and the

legal position flowing therefrom. The relevant facts concerning the conversation are as follows.

Briscoe checked the television monitor at Reedy Point, found good visibility, and at 0630 called the bridge tender. He then attempted to change the traffic light from red to green.[1] Briscoe called each of the ships at anchor and received no reply from the YORKMAR. He cleared the STEWART and the POTHITI at 0655 and 0717, respectively. At approximately 0645 he received a call via the Wilmington operator from the YORKMAR, during which he was advised that the YORKMAR had channel 13 transmission difficulties. Briscoe told the YORKMAR to follow the fourth ship in and to use channel 16 or 18. Briscoe did not recall any "obstruction free" clearance. His "clearance" to the YORKMAR was intended merely as authority to get underway and not actual clearance to enter the Canal, as he expected a further communication as the YORKMAR passed the breakwater. When relieved by Longacre (at 0715), Briscoe advised him that no clearance had been given to the YORKMAR or any other ship that was not already in the Canal. He did tell Longacre that the YORKMAR had radio difficulty.

On these facts, it is clear that the fault was that of the YORKMAR. The established customary clearance procedure was to communicate (somehow) with the dispatcher upon passing the breakwater. The YORKMAR failed to do so.

The question to be addressed, conceding YORKMAR's fault in failing to notify the dispatcher, is:

Did Briscoe have a duty to anticipate the YORKMAR's negligence in failing to secure a proper clearance?

The same analysis applies here as was employed in considering the bridge tender's failure to anticipate the YORKMAR's fault. Once again the factors to be weighed are the magnitude of the harm to be anticipa-

---

1. Actually, the traffic light remained red. The error was either human or electronic, causing all ships to enter the Canal against a red signal.

ted from the YORKMAR's negligence, the probability of such negligence occurring and the weight of the burden on the dispatcher which would be imposed by taking additional precautions. The factors balance very differently here. First, the harm to be anticipated from an unaccounted for vessel in the Canal was, of course, tremendous. Second, Briscoe had strong reason to suspect that the YORKMAR might ignore the customary clearance procedure. He knew that the YORKMAR had no channel 13 transmitter, and he should have realized that his "clearance" was at the very least ambiguous. It could have been interpreted (in fact it was interpreted by the YORKMAR) as authority to enter the Canal. Further, he had strong reason to suspect that the Bridge would ultimately be lowered, especially if the Canal were closed for bad weather. Briscoe, therefore, should have realized that the probability of confusion was relatively great and that the harm to be anticipated was catastrophic. Accordingly, he should have given Longacre a complete briefing on the conversation with the YORKMAR. At this point, the final factor must be evaluated—how burdensome would it have been for Briscoe or Longacre to act to avoid the allision? The answer is clear that it would have been relatively simple. Either dispatcher could have called the vessel and asked for confirmation via Wilmington. Either could thus have easily ascertained her position. Finally, it would have been a small burden to simply call the bridge tender and order the Bridge open until some clarification of the known risk was achieved.

An alternate theory to establish the liability of the Corps is that it did not adequately (as a matter of general practice) supervise navigation in the Canal. The Corps' duty stems from 33 U.S.C. § 1 and its own regulations which were promulgated pursuant to that statute.[2] These regulations were published as 33 C.F.R. 207.00 and supplemented by rules dated 12/22/72 is-

sued by the Corps. The regulations provide in part:

207.100

(b) *Supervision* : The District Engineer, Corps of Engineers, Philadelphia, Pa., has administrative supervision over the waterway and is charged with the enforcement of these regulations. The District Engineer from time to time will prescribe rules governing the dimensions of vessels which may transit the waterway *and other special conditions and requirements which will govern the movement of vessels using the waterway.* The D.E.'s representative is the Chesapeake City Resident Engineer. The Chesapeake City R.E., through the dispatcher on duty, will enforce these regulations *and monitor traffic through the canal.* (Emphasis added.)

The statute and regulations give the Corps plenary power and responsibility for the supervision of the waterway. The Corps, having such power and duty, is therefore charged with issuing unambiguous procedures governing the passage of vessels through the Canal. In the face of this heavy responsibility, the Corps' efforts were plainly inadequate.

First, the procedures for establishing a "clearance" are ambiguous. The applicable rule is contained in the Notice to Mariners of December 22, 1972:

2.(d) These vessels [vessels transiting the Canal] will not enter the Canal until a radio communication is established with the dispatcher at Chesapeake City and a clearance is received. Radio communication shall be established on 156.65 mc/s [channel 13].

This regulation is clearly insufficient to clarify the concept of "clearance." It does not indicate at what point, geographically, the vessel must make radio contact, nor does it indicate what constitutes a "clear-

---

**2.** 33 U.S.C. § 1 provides in part:

It shall be the *duty* of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable

waters of the United States as in his judgment the public necessity may require *for the protection of* life and property . . . (Emphasis added.)

ance." Leaving these matters to custom or chance resulted in the ambiguity which was a proximate cause of the allision here.

Second, there was a complete lack of organized communication between the dispatchers and the bridge tenders. The dispatchers did not generally know whether the Bridge was up or down; the tenders were not required to notify the dispatcher of the position of the Bridge. The dispatcher had no railroad schedule, and in general made no attempt to determine the status of the Bridge. The Corps maintains that the passage of the vessels under the Bridge was a matter solely between the vessel and the tender. This limited view of its own responsibility does not adequately account for the Corps' plenary power as the only overall supervisory agency in charge of the Canal. It cannot delegate away its responsibilities to "monitor traffic" in the Canal.

[7] Third, there was no established procedure by which dispatchers communicated relevant information to their relief men. Prudent operating procedures would require notification to the relief man of the position of each vessel in the Canal and each vessel at anchor awaiting "clearance." In general, the dispatchers were not adequately supervised; indeed from the testimony of Bernard Schwartz, in charge of the dispatchers and the Canal's operations, it appears that they were not supervised at all on issues of safety and uniform operating procedures. In general, if the Government undertakes to perform a certain function (whether or not it had an original duty to perform that function) it must perform it with due care. *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In that case the United States was found liable for its negligence in failing to properly maintain a lighthouse

light. Other cases have held the Government (usually the Coast Guard) liable for failure to properly place or maintain an aid to navigation. *See, e. g., Greer v. United States*, 505 F.2d 90 (5th Cir. 1974) (failure to return to its proper position a buoy which had drifted from its charted position); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971) (dissemination of an inaccurate chart); *Reliable Transfer Co., Inc. v. United States*, 497 F.2d 1036 (2nd Cir. 1974), *aff'd*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (failure to maintain a light); *Afran Transport Co. v. United States*, 435 F.2d 213 (2nd Cir. 1970) (failure to replace wandering buoy). Although these cases refer to a particular negligent act or omission regarding a single aid to navigation, they are equally persuasive where, as here, the entire administration of the Canal by the Corps lacked careful planning required of such an undertaking. The Corps undertook the responsibility of supervising navigation of the Canal; indeed it was required to do so by statute (33 U.S.C. § 1) and by its own regulations (33 C.F.R. § 207.100(b)). Its slipshod performance of these duties of supervision forces the conclusion that its entire operation of the Canal lacked due care.[3]

▮ As a result of the actions, or lack thereof, by the Corps, it was 40% at fault in the allision.

## C. *The YORKMAR*

The fault of the YORKMAR is most conveniently analyzed in three categories: Pennsylvania Rule Violations, Unseaworthy Personnel and Equipment, and Other Operating Negligence.

---

**3.** Note that this Court need not decide whether the negligence of the Corps should be characterized as a matter of "planning" or "operations." That distinction results from a construction of the "discretionary function" to the Federal Tort Claims Act, 28 U.S.C. § 2680. That exception retains the sovereign immunity of the United States with respect to "any claim . . . based upon the exercise or performance or the failure to perform a discretionary

function . . . ." This case does not arise under the Federal Tort Claims Act, however. Jurisdiction is based instead upon 46 U.S.C. § 742, and that statute does not contain a "discretionary function" exception. Several courts have held that this exception should not be "read into" 46 U.S.C. § 742. *See, e. g., Lane v. United States*, 529 F.2d 175, 179 (4th Cir. 1975); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 146 (5th Cir. 1971).

### 1) PENNSYLVANIA RULE VIOLATIONS

██ The Pennsylvania Rule, taken from the case of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), sets out the following presumption: Where a vessel has been guilty of "statutory fault" before a collision, the vessel can escape liability only if it can show that its fault *could not have contributed* to the collision. Gilmore and Black, *The Law of Admiralty* (2nd ed. 1975) at § 7–5. The Supreme Court's decision to abandon the divided damages rule in favor of the doctrine of comparative fault (*see Reliable Transfer, supra*) has somewhat diminished the harsh results which the Pennsylvania Rule might cause, but it has not abrogated the rule itself. Before considering the specific faults of the YORKMAR, another point must be noted—a "statutory fault" consists of a failure to obey any rule, statute *or* administrative regulation (promulgated pursuant to the agency's statutory authority), which is designed to eliminate collision or facilitate navigation. *Belden v. Chase*, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); Griffin on Collision § 200 (1949).

 *(a)* The United States and claimant Brazil have argued that the YORKMAR was guilty of violations of various provisions of the Radiotelephone Act. 33 U.S.C. §§ 1202, et seq. It is argued that the YORKMAR violated 33 U.S.C. § 1205 which provides in part:

> If the radiotelephone equipment carried aboard a vessel ceases to operate, the master shall exercise due diligence to restore it or cause it to be restored to effective operating condition at the earliest practicable time. The failure of a vessel's radiotelephone equipment shall not, in itself, constitute a violation of this chapter, nor shall it obligate the master of any vessel to moor or anchor his vessel; *however, the loss of radiotelephone capability shall be given consideration in the navigation of the vessel.* (Emphasis supplied.)

It is argued that Captain Edelheit and Pilot Sundling did not give adequate consideration to the loss of channel 13 capability because they attempted a transit of the Canal in poor weather absent this facility. Pilot Sundling clearly gave some thought to the breakdown in that he called the dispatcher via the Wilmington marine operator. This simple act followed by Sundling's complete subsequent disregard of his vessel's lack of radio capacity does not rise to the level of the consideration required by the act.

Calmar's opponents also argue that the YORKMAR violated section 1204 of Title 33:

> The radiotelephone required by this chapter is for the exclusive use of the master or person in charge of the vessel, or the person designated by the master or person in charge to pilot or direct the movement of the vessel, *who shall maintain a listening watch on the designated frequency.* (Emphasis supplied.)

47 C.F.R. § 83.207 expands somewhat on this directive:

> Such watch shall be maintained by the master or person in charge of the vessel or the person designated by the master or person in charge to pilot or direct the movement of the vessel. *The person standing watch may perform other duties provided such other duties do not interfere with the effectiveness of the watch.* (Emphasis supplied.)

The evidence indicates that Sundling was quite busy with the conning of the ship, and that this demanding task may have interfered with his listening watch to a degree prohibited by section 83.207. But it is not at all clear that the "other duties" of section 83.207 include duties of conning the ship. In other words, these duties might be presupposed by the statute and regulation to invariably accompany the listening watch. The Court need not reach this legal question for there are sufficient facts to require a finding that the listening watch was not adequate. It is clear that there were ample communications over channel 13 which should have indicated to a reasonable monitor that the Bridge might be closed. Despite the undisputed broadcasts

and the undisputed fact that YORKMAR's channel 13 *receiver* was in operating condition, the vessel was not alerted to the danger of the Bridge. These facts compel the conclusion that the listening watch was not adequate.

The YORKMAR has not met, nor could it possibly meet, its Pennsylvania Rule burden of showing the failure of the listening watch could not have contributed to the allision. It is clear that this failure was an actual and proximate cause of the allision.

■■■ *(b)* The United States argues that the YORKMAR entered the Canal when the traffic light was red. The existence of traffic lights is provided by 33 C.F.R. § 207.100(j). Their operation is governed by the Notice to Mariners of 22 December 1972, which provides in part as follows:

3. The traffic lights located at Reedy Point and Town Point are equipped with flashing green, amber and red lights. The lights are defined as follows:

c. Red light—Waterway closed to traffic. All vessels must stop.

The evidence indicates that Briscoe intended to change the traffic signal from red to green prior to the passage of any of the ships. However, some failure or error (mechanical or human) resulted in the light's remaining red all morning. Thus, all the ships, including the YORKMAR, entered the Canal against a red signal. The YORKMAR, then, was clearly guilty of statutory fault. She could not possibly meet her Pennsylvania Rule burden of showing that the violation played no part in causing the allision.

*(c)* It is not disputed that the YORKMAR was guilty of statutory fault in that it failed to give the whistle signals required by 33 C.F.R. § 117.235(a). That regulation provides for certain whistle signals between a vessel and the bridge tender. The signal which the YORKMAR should have given was three blasts. The bridge tender was to have responded with four blasts if the bridge could not be opened.

■■■ All credible testimony indicates that the whistle signals were at the time outmoded—replaced by communication over channel 13. The rule was not followed by any of the pilots. This point in itself is not conclusive since an industry cannot establish its own standard of care by its own generally negligent operating procedures. *Marsh Wood Products Co. v. Babcock & Wilcox Co.*, 207 Wis. 209, 240 N.W. 392 (1932). However, it was further shown that none of the bridge tenders had ever heard the signals before and would not have known what they meant. Following the signal rule would have produced, in all likelihood, no reaction from the Bridge. Thus, letter perfect adherence to the regulation could not have averted the allision; the YORKMAR has met her Pennsylvania Rule burden on this point.

■■■ *(d)* The United States has accused the YORKMAR of violations of Article 16 of the Inland Rules of the Road, 33 U.S.C. § 192. The first paragraph of Article 16 provides:

Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

The credible evidence indicates that visibility at the time of the allision was approximately one fourth mile and that the YORKMAR was proceeding at about six knots (through the water) which, combined with a two-knot fair current, resulted in an over-the-ground speed of about eight knots. The question, then, is whether this speed was the "moderate" speed required by Article 16. The "rule of sight" is a well recognized interpretation of the statutory term "moderate speed." The rule defines a "moderate speed" as that:

"rate of speed as would enable [the vessel] to come to a standstill, by reversing her engines at full speed before she could collide with a vessel [or bridge] which she could see through the fog." The Nacoochee, 137 U.S. 330, 339, 11 S.Ct. 122, 125, 34 L.Ed. 687 (1890).

*Union Oil Co. of California v. The San Jacinto,* 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972). If two vessels are ap-

proaching each other the rule of sight becomes the one half distance rule allowing each vessel that speed which would permit it to stop short of the collision. *See generally, Griffin on Collision* § 117 (1949), Gilmore and Black, *The Law of Admiralty* § 7–10 (2nd ed. 1975). If this rule is straightforwardly applied to the YORKMAR, it is clear that she violated Article 16. She was not able to stop within the entire distance of visibility even at full reverse.

The YORKMAR argues that six knots through the water was the absolute minimum speed at which she could maintain adequate steerage in the narrow Canal and that, therefore, her speed was "moderate." Some cases have accepted this argument, particularly in circumstances where a narrow channel and a long vessel make good steerage way an absolute necessity. *See, e. g., Hess Shipping Corporation v. the SS CHARLES LYKES,* 417 F.2d 346 (5th Cir. 1969), *rehearing den.,* 424 F.2d 633, *cert. den.,* 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 91, *rehearing den.,* 400 U.S. 931, 91 S.Ct. 184, 27 L.Ed.2d 191. The weight of authority, and better reasoned theory, however, appear to be opposed. *See, e. g., Anglo–Saxon Petroleum Co. v. United States,* 224 F.2d 86 (2nd Cir. 1955); *Barrois Bros., Inc. v. Lake Tankers Corporation,* 188 F.Supp. 300 (E.D.La.), *aff'd per curiam,* 286 F.2d 573 (5th Cir. 1961). *Griffin on Collision* § 124 (1949). These authorities hold that if a vessel's minimum steerage speed is greater than that which would permit a complete stop within the limits of visibility, her obligation is not to be under way. Justice Strong in the *Pennsylvania,* 86 U.S. (19 Wall.) 125, 134, 22 L.Ed. 148 (1873), explained the view as follows:

> And even if it were true that such a rate (seven knots) was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to.

The YORKMAR counters this argument with the contention that anchoring in the channel would have resulted in even greater danger to navigation. Furthermore, any such action would have violated 33 C.F.R. § 207.100(1). The response to this argument is that the YORKMAR should not have entered such a waterway in reduced visibility. The credible evidence indicates, in fact, that the visibility was such that a competent pilot would not have entered the Canal, particularly if he lacked a channel 13 transmitter. Indeed, several such pilots with functioning radios decided to remain at anchor rather than test the questionable visibility.

The second paragraph of Article 16 provides:

> A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines and then navigate with caution until danger of collision is over.

The evidence indicates that several of the crew of the YORKMAR heard a rumbling noise and a whistle forward of the beam and that this information was relayed to the pilot. Further, it is clear that the YORKMAR did not immediate stop her engines. Since a train traversed the Bridge just prior to the allision and since there were no other ships within hearing distance of the YORKMAR, it is safe to assume that the whistle was the train's whistle.

The facts do not fit squarely within the language of Article 16 since there was no fog signal from a vessel. The consequences of application of the Pennsylvania Rule are somewhat harsh—imposition of a rigid standard of proof of a negative proposition. Thus, the rules themselves should be strictly construed and the failure to heed the whistle is better dealt with under the heading of "operational negligence," rather than "statutory fault."

### 2) UNSEAWORTHINESS

#### (a) *Unseaworthy Personnel*

Several claimants, chiefly Brazil, argue that the YORKMAR was unseaworthy because of the actions of Pilot Sun-

dling and Captain Edelheit. It is clear that the operator of a vessel has a duty to send it out and maintain it in seaworthy condition. *See generally Usner v. Luckenback Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), and cases cited therein at 496–498, 91 S.Ct. 514; Gilmore and Black, *The Law of Admiralty* (2nd ed. 1975). The duty is absolute and breach does not require the existence of negligence on the part of the owner. *Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922), *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Furthermore, it is clear that an unseaworthy condition need not be a permanent fixture of the vessel but may be merely a transitory or momentary unfitness. *See, e. g., Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) (a slippery ship's rail caused by the presence of fish gurry and slime). Finally, it is clear that owner's duty extends to supplying a seaworthy crew—men "equal in disposition [and skill] to the ordinary men of that calling." *Boudoin v. Lykes Brothers Steamship Co., Inc.,* 348 U.S. 336, 340, 75 S.Ct. 382, 385, 99 L.Ed. 354 (1955).

At this point the clarity diminishes somewhat. The question which causes the disagreement among the parties is this: Is the negligence of a crew member *simpliciter* sufficient to render a vessel unseaworthy? In *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), the Supreme Court held a vessel unseaworthy because a mate had selected a defective rope for use even though suitable ones were available. Similarly, an isolated act of negligence by a crew member (misuse of a piece of cargo-unloading equipment) was held to render a vessel unseaworthy in *Crumady v. The J. H. Fisser,* 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

▮ But in *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971), where plaintiff, a longshoreman, was injured when a fellow longshoreman, operating a power winch, negligently allowed the winch's sling to fall on plaintiff, the Court said, at 500, 91 S.Ct. at 518:

What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo, or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions. (Footnotes omitted.)

The distinction which the Court is drawing in *Usner* might be paraphrased as follows: A condition, transitory or otherwise, of a crew member (lack of skill, knowledge, etc.) rendering him not fit for his ordinary duties or not up to the ordinary standards of his profession renders the vessel unseaworthy; an isolated act of negligence committed by an otherwise competent crew member does not.

▮ The facts of this case indicate that Pilot Sundling's errors cannot be adequately described as an isolated act of negligence, or even a series of such acts. Sundling's failing was a lack of knowledge of the customary (but mandatory) requirements for passage through the Canal. He did not know, for instance, that a channel 13 call prior to entering the breakwater was a required condition of entry into the Canal. Had he known this he could not have mistaken the dispatcher's authorization to get underway as a "clearance" to enter the Canal. Further, the evidence indicates that he misunderstood the customary significance of a "clearance." He interpreted it to mean the Canal was free of obstacles; actually it had no such meaning. Finally, he failed to realize that custom required him to contact the Bridge by channel 13 or some other method. These failures of Sundling's were not merely failures to exercise due care; they are an indication of his lack of sufficiently precise knowledge of the customary law of a particular waterway—a knowledge that the ordinary canal pilot should have. Accordingly, the YORKMAR

must be found *unseaworthy* by dint of his failings. The findings of fact and prior conclusion of law in this opinion leave no doubt that Sundling's failures were an actual and proximate cause of the allision.

It has also been argued that Captain Edelheit's incompetence rendered the YORKMAR unseaworthy. This contention must fail. Edelheit was not an expert in the Canal nor was he held out to be one. Sundling's failures were not obvious to one who was not an expert; accordingly, Edelheit had no duty to take control of the ship from Sundling. Edelheit was not a cause of the vessel's unseaworthiness nor was he guilty of any personal operational negligence.

(b) *Unseaworthy Equipment*

■■■■ The facts surrounding the operability of the YORKMAR's channel 13 transmitter are not entirely clear. It is clear that the transmitter was inoperative while the YORKMAR was anchored and probably inoperative when she entered the Canal. It is also clear that the transmitter operated properly when tested after the allision. It is unclear whether the defect was a mechanical or electrical one, remedied by the sharp shock of the allision or merely a temporary result of low power output and atmospheric conditions. That the failure was totally caused by extrinsic factors is highly unlikely; it persisted for some time and it was not experienced by the other vessels in the area. Accordingly, it is highly probable that the transmitter had, at least temporarily, some mechanical or electrical defect that inhibited its performance. It is well settled that such a defect in equipment, however transitory, may render a vessel unseaworthy. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The Court finds, then, that the defective transmitter rendered the YORKMAR unseaworthy and that the defect was an actual and proximate cause of the allision. Indeed the problem with the transmitter might be deemed the original cause which set in motion the entire chain of circumstances, faults and misunderstandings which resulted in the tragedy.

### 3) OPERATIONAL NEGLIGENCE

■■■ Operational negligence of the YORKMAR's pilot is sufficient to render her at fault in the allision. Instances of operational negligence are not difficult to find. Most of the instances have been discussed under the heading of statutory fault or unseaworthiness. Accordingly, they now need little discussion. It is sufficient to note that Sundling's errors (see section 2(a) above) qualify as instances of operational negligence (even if they were not sufficient to render the YORKMAR unseaworthy). Equally certain is the conclusion that these errors were actual and proximate causes of the allision. By way of example, the errors include at least the following: the decision to enter the waterway under reduced visibility with no channel 13 transmitter, failure to obey the traffic light, failure to respond immediately to the train whistle and operation at excessive speed under the existing conditions.

### 4) CONCLUSION

■■■ As a result of the YORKMAR's statutory faults, her unseaworthy pilot and equipment, and the operational negligence of the pilot, the YORKMAR was 50% at fault in the allision.

## II. DEFENSES TO OR LIMITATIONS OF LIABILITY

### A. *Bethlehem/Calmar*

### 1. THE DEFENSE OF COMPULSORY PILOTAGE

■■■ Bethlehem has raised as a defense to its liability the doctrine of compulsory pilotage. The doctrine may be stated as follows: When a vessel is required by compulsion of state or federal law to employ a pilot in certain waters, and a collision results which is the sole fault of the pilot, the owners of the vessel are not liable *in personam*, but the vessel itself is liable *in rem. See generally* Gilmore and Black, *The Law of Admiralty* (2nd ed. 1975) § 7–16; *Griffin on Collision,* §§ 191–195.

This defense raises several issues which must be resolved. First, it must be determined whether or not Sundling was a compulsory pilot. It is clear that a statute which prescribes a fine or imprisonment for failure to take a pilot imposes compulsory pilotage. Gilmore & Black, *The Law of Admiralty* (2nd ed. 1975) § 7–16. The relevant statutes in this case are 46 U.S.C. § 364 and § 224. Section 364 provides as follows:

> . . .; and every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the Coast Guard.

*See also* 46 C.F.R. § 157.20–40(a) for a restatement of this requirement, and 46 C.F.R. § 10.05–39 and § 10.05–42 for Coast Guard regulations for licensing pilots. Section 364 (cited above) applies to the YORKMAR since she is a United States merchant vessel sailing in the coastwise trade and therefore sails not under "register" but under "enrollment."[4] 46 U.S.C. § 224 puts the required "compulsion" into the pilotage mandated by section 364:

> . . . It shall be unlawful to employ any person or for any person to serve as . . . pilot of any steamer . . . who is not licensed by the Coast Guard; and anyone violating this section shall be liable to a penalty of $100 for each offense.

46 U.S.C. § 364 and § 224 thus leave no doubt that Pilot Sundling was employed pursuant to compulsory pilotage provisions.

**4.** A United States merchant vessel sailing in foreign trade sails under a register. *See Anderson v. Pacific Coast Steamship Co.*, 225 U.S. 187, 32 S.Ct. 626, 56 L.Ed. 1047 (1912), for a complete explanation of enrollments and registers and their effect on compulsory pilotage.

**5.** Subsection (b) of § 183 provides as follows:
(b) In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) of this section is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less than $60 per ton of such ves-

The finding of compulsory pilotage does not end the inquiry. Before Bethlehem/Calmar can defeat its *in personam* liability it must show that the YORKMAR's fault in the allision was the fault of Sundling alone, *i. e.*, that no other fault of the YORKMAR or her crew was a contributing cause. *THE CHINA*, 74 U.S. (7 Wall.) 53, 64, 19 L.Ed. 67 (1868); *Smith v. Condry*, 42 U.S. (1 How.) 28, 35–36, 11 L.Ed. 35 (1842). Bethlehem/Calmar has not carried this burden; the Court has already found the YORKMAR unseaworthy due to the condition of its channel 13 transmitter. Since the YORKMAR's fault was not totally that of Sundling, Bethlehem/Calmar cannot avail itself of the pilotage defense to *in personam* liability.

## 2. LIMITATION OF LIABILITY

Bethlehem/Calmar seeks to limit its liability for damages resulting from the allision by invoking the Limitation of Liability Act, 46 U.S.C. § 181 et seq. Section 183(a) of the Act provides:

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or *injury by collision*, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge* of such owner or owners, shall not, except in the cases provided for in subsection (b)[5] of this section, exceed the amount or value of the interest of

sel's tonnage, such portion shall be increased to an amount equal to $60 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts.
Depending upon the damages which the personal injury and death claimants can prove and the present value of the YORKMAR, this subsection rather than § 183(a) may control the fund available to the personal injury and death plaintiffs.

such owner in such vessel, and her freight then pending. (Emphasis supplied.)

The only serious question which arises under this section is whether the fault of the YORKMAR, which was a contributory cause of the allision was "without the privity or knowledge" of the owner. Several preliminary issues must be considered before this central question can be addressed. First, since the owner of the YORKMAR is a corporation, the parties who must be charged with privity or knowledge are the corporation's "managing officers" or its "supervisory shore personnel." *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 510–512, 52 S.Ct. 450, 76 L.Ed. 903 (1932). Second, the shipowner bears the burden of proving the absence of privity or knowledge. *Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Coleman v. Jahncke Service, Inc.*, 341 F.2d 956 (5th Cir. 1965).

■■■■ The fault related activities with respect to which Bethlehem/Calmar might have privity or knowledge are in two areas. First, there are the errors in navigation committed by the pilot or the master (see sections C1 and C3). The general rule is that errors in navigation or negligence of the master or crew do not preclude limitation. *THE TITANIC*, 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171 (1914); *THE BOURGOGNE*, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 993 (1908). The second basis of liability of Bethlehem/Calmar is the unseaworthiness of the crew and equipment of the YORKMAR. Privity or knowledge of an unseaworthy condition exists when the owner has actual knowledge of the unseaworthy condition or through the use of reasonable diligence could have acquired such knowledge. *Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769 (5th Cir. 1966). Bethlehem/Calmar has met its burden of showing lack of privity or knowledge of the unseaworthiness of the crew (Sundling). The shipowner produced evidence of Sundling's impressive credentials—credentials which would preclude any finding of negligent hiring. Indeed, Sundling's unsea-

worthiness proved to be of a very subtle sort. Although he was unaware of certain key customs involved in the navigation of the C&D Canal, there was no way that due diligence could have revealed to the shipowner that Sundling lacked the highly specialized knowledge required. No general set of test questions or guidelines for hiring would have indicated Sundling's weakness; and the owner cannot be required to quiz a prospective pilot on every conceivable rule of navigation and custom.

■■■■ The next question concerns Bethlehem/Calmar's privity or knowledge with respect to the unseaworthy condition of the YORKMAR's channel 13 transmitter. Evidence was introduced to show that three telephone calls were placed from the YORKMAR to Bethlehem/Calmar's supervisory shore personnel in Baltimore in the morning hours before the allision. All participants in the conversations testified that there was no discussion of the YORKMAR's channel 13 problems. Discussions were limited to estimates of the time of YORKMAR's arrival in Baltimore—such estimates being necessary to assure the proper port services for the YORKMAR when she arrived. Accordingly, the Court finds that the supervisory shore personnel had no privity or knowledge with respect to the radio problem. Bethlehem/Calmar has again met its burden.

### B. The United States

The Corps of Engineers argues that the Penn Central's claim against it is non-maritime. The argument is that the damage complained of—losses resulting from inability to use the Bridge—and the negligence causing the damage both occurred on land.

■■■■ The first question which must be addressed is whether the fact that the Corps' negligence occurred on land defeats admiralty jurisdiction. The traditional test for maritime jurisdiction involving tort cases is the locality test. The test first articulated by the Supreme Court in *THE PLYMOUTH*, 3 Wall. 20, 35, 36, 18 L.Ed. 125 (1866), was recently explained by the

Court in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972):

> In *THE PLYMOUTH*, 3 Wall. 20, 35, 36, 18 L.Ed. 125 (1866) the Court essayed a definition of when a tort is "located" on navigable waters:
>
>> "[T]he wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same must have taken place upon these waters to be within the admiralty jurisdiction . . . ."

In the instant case it is clear that the "substance and consummation" of the wrong (namely the allision) occurred on navigable waters. The courts have consistently rejected the argument that land-based negligence which causes injury on the seas is outside admiralty jurisdiction. *See, e. g., Reliable Transfer Co., Inc. v. United States*, 2 Cir., 497 F.2d 1036 (1974), *aff'd*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (failure to maintain a land-based light resulting in a vessel's running aground); *De-Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971) (failure to properly mark an underground cable on a chart resulting in damage to a vessel whose anchor struck the cable); *Hess, Inc. v. THE ARIZONA*, 149 F.Supp. 733 (S.D.N.Y.1955), *aff'd*, 242 F.2d 706 (2nd Cir. 1957) (negligent preparation of sounding chart resulting in a vessel's running aground); *Dunn v. Wheeler Shipbuilding Corp.*, 86 F.Supp. 659 (E.D.N.Y.1949) (negligent construction of a vessel caused its loss at sea). It is certain, then, that the Court's admiralty jurisdiction is not defeated merely because the negligence of the Corps occurred on land.

■ The second issue posed by the Corps' jurisdictional argument is whether admiralty jurisdiction lies even though the damages which the Railroad claims occurred on land. Originally the owner of a land-based structure (a bridge or a wharf) could not sue in admiralty for damages caused by a vessel. Gilmore and Black, *The Law of Admiralty* (2nd ed. 1975) § 7–17. In 1948, Congress corrected this anomaly by passing into law the Extension of Admiralty Jurisdiction Act:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

46 U.S.C. § 740. The statute permits one who sustains injury on land to sue in admiralty if his injury is caused by a vessel on navigable waters. *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Garrett v. Gutzeit O/Y*, 491 F.2d 228 (4th Cir. 1974). In the instant case the damage was clearly caused by a vessel on navigable waters. (The land-based negligence of the Corps was a contributing cause of the damage caused by the vessel.) The land-based damage to the Railroad (re-routing expenses and lost revenue) was the natural and foreseeable consequence of the allision.

■ The Corps of Engineers is an instrumentality of the United States Government, raising the question of sovereign immunity to Penn Central's claim. The issue turns on the construction of 46 U.S.C. § 742, which provides in part:

> In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, *or if a private person* or property *were involved*, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . (Emphasis supplied.)

It might be argued that this section contains a consent to suit in Admiralty against the United States only if a vessel of the Government is involved. At least one court has expressly adopted that view. *J. W. Petersen Coal & Oil Co. v. United States*, 323 F.Supp. 1198, 1203 (N.D.Ill.E.D.1970). This interpretation does some violence to the language of section 742. The words "[or] if a private person . . . were involved" seem to indicate that the United States shall be amenable to a suit in admi-

ralty in cases where an admiralty proceeding could be brought if the action done by an agent of the United States had been done by a private person. This reading of the statute would not require the involvement of a vessel of the United States. This interpretation is supported by the weight of authority as well as the plain language of the statute. *Roberts v. United States*, 498 F.2d 520 (9th Cir. 1974); *DeBardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971); *Utzinger v. United States*, 246 F.Supp. 1022 (S.D.Ohio 1965); *Tankrederiet Gefion A/S v. United States*, 241 F.Supp. 83 (E.D.Mich.S.D.1964). After an exhaustive review of the statute's legislative history, the evil to which it was directed and its plain words, the court in *DeBardeleben, supra* at 145 concluded:

> If one were bringing an action against a private cartographer for maritime injuries from the negligent publication of a marine chart, he could bring "a proceeding in admiralty," . . . And the case certainly satisfies the requirement that "if a private person . . . were involved," the claimant could proceed in admiralty . . .

A similar situation exists under the claim of the Penn Central. Had a private person negligently contributed to the YORKMAR's allision, he would be amenable to suit in Admiralty. Section 742 does nothing more or less than put the United States on an equal footing with the "private person."

In summary, the jurisdictional argument of the Corps can be disposed of as follows: Traditionally Admiralty has had jurisdiction even though harm on navigable waters was caused by land-based negligence. 46 U.S.C. § 740 extends admiralty jurisdiction to harm caused by a vessel which results in damages on land. 46 U.S.C. § 742 puts the Corps in the same shoes as a private individual. Thus, the Railroad's claim for land-based damages against the Corps for its land-based negligence (resulting in the allision on navigable waters) is within the admiralty jurisdiction of this Court.

The findings of fact and conclusions of law made herein are in accordance with the requirements of Rule 52, F.R.Civ.P., whether or not so specifically designated.

An order to direct the further proceedings in this case will be entered in accordance with the foregoing opinion.