**1532**

APAC–ARKANSAS, INC., by ARKHOLA SAND & GRAVEL COMPANY, A DIVISION OF APAC–ARKANSAS, INC., Plaintiff,

v.

TUGBOAT MELISSA L; Her Engines, etc., BARGE SFI 41, BARGE SFI 44, BARGE SFI 51, General Marine Towing Company, Inc. A Corporation, and System Fuels, Inc., A Corporation, Defendants and Third-Party Plaintiffs,

v.

BURLINGTON NORTHERN RAILROAD COMPANY and Missouri Pacific Railroad Company, Third Party Defendants.

H.E. CUMMINS & SONS CONSTRUCTION COMPANY, INC., Plaintiff,

v.

GENERAL MARINE TOWING COMPANY, INC.; System Fuels, Inc., Burlington Northern Railroad Company and Missouri Pacific Railroad Company, Defendants.

Civ. No. 82–2235, 83–2295.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

July 31, 1985.

Ben Core, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for plaintiff in No. 82–2235.

Joel J. Henderson, Frank J. Dantone of Henderson, Duke & Dantone, Greenville, Miss., for General Marine Towing Co., Inc., System Fuels, Inc. and The M/V Melissa L.

Broox G. Holmes of Armbrecht, Jackson, Demouy, Crowe, Holmes & Reeves, Mobile, Ala., Douglas O. Smith, Jr. of Warner & Smith, Fort Smith, Ark., for Burlington Northern R. Co.

James W. Moore, Frederick S. Ursery of Friday, Eldredge & Clark, Little Rock, Ark., for Missouri Pacific R. Co.

Bradley D. Jesson of Hardin, Jesson & Dawson, Fort Smith, Ark., for plaintiff in No. 83–2295.

## MEMORANDUM OPINION

### H. FRANKLIN WATERS, Chief Judge.

#### Introduction

At approximately 1:35 p.m. on July 3, 1982, the diesel towboat, M/V MELISSA L, which had in tow three tank barges, each approximately 297 feet in length and loaded with a total of 7,500 tons of fuel oil, allided with the Burlington Northern Railroad Company railroad bridge which spans the Arkansas River at approximately mile 300.8. The bridge connects Van Buren and Fort Smith, Arkansas, across the McClellan-Kerr navigable waterway of which the Arkansas River at this point is a part. The allision occurred when the center movable span was lowered by a Missouri Pacific Railroad Company train crew in preparation to crossing the river. As a result of this allision, the tow of the M/V MELISSA L separated from the towboat and traveled downstream, causing substantial damage to the M/V MELISSA L and the railroad bridge owned by the Burlington Northern Railroad Company, and to certain facilities owned by APAC–Arkansas, Inc. (APAC), and H.E. Cummins & Sons Construction Company, Inc. (Cummins), located on the riverbank downstream from the bridge.

Damages are stipulated by the parties as follows:

| | |
|---|---|
| H.E. Cummins & Son Construction Company, Inc. | $265,000.00 |
| APAC–Arkansas, Inc., by Arkhola Sand and Gravel Company, a Division of APAC–Arkansas, Inc. | 26,152.50 |
| System Fuels, Inc. | 200,000.00 |
| Missouri Pacific Railroad Company | 74,634.99 |
| Burlington Northern Railroad Company | 219,066.00 |

It was also stipulated that prejudgment interest at the rate of ten percent (10%) per annum from July 4, 1982, would be awarded as a result of any judgment rendered in these cases.

APAC sued the MELISSA L and her owner, System Fuels, Inc., and her operator, General Marine Towing Company, Inc. (referred to collectively during the trial as "the Boat People") in Case No. CIV 82–2235. The Boat People brought into that lawsuit, as third-party defendants, Burlington Northern Railroad Company (Burlington), the owner of the bridge, and Missouri Pacific Railroad Company (MOPAC), the employer of the crew that lowered the bridge. Cummins sued the Boat People, Burlington and MOPAC in Case No. CIV 83–2295.

Burlington, as owner of the bridge, seeks recovery for damages to the bridge and other incidental expenses, and MOPAC, the user of the bridge under an existing track agreement with Burlington, seeks recovery for damages incurred as a result of having to reroute its trains and for any damages it may have to pay to any other party. The Boat People seek recovery for damages sustained to the M/V MELISSA L and her tow, along with incidental expenses incurred while the tow was out of service. Burlington, MOPAC and the Boat People seek contribution and indemnity from each other for any monies that they are required to pay as a result of the allision.

The cases were consolidated for trial by this court, and are an admiralty or maritime cause of action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 46 U.S.C. § 1333. The court has jurisdiction of the subject matter and of the parties to this litigation. Venue is

proper in the United States District Court for the Western District of Arkansas, Fort Smith Division. Trial was before this court without a jury, and the court has received proposed findings of fact and conclusions of law and briefs from each of the parties and is now prepared to rule. The discussion by the court will be considered to be the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

### The M/V MELISSA L And The River

On the date of the accident, the M/V MELISSA L was a diesel powered towboat of approximately 3180 horsepower, 112′ × 34′. She had in tow two barges, each measuring 295 feet in length and 54 feet in width, and one measuring 297 feet in length and 54 feet in width. Two of these barges were loaded with fuel oil to drafts of approximately 8′6″, while the other barge was loaded to a draft of 6′8″. The barges were made up or joined together end on end, and the entire flotilla was approximately 1,000 feet long. The M/V MELISSA L had loaded these barges in Muskogee, Oklahoma, and was downbound on a trip to Louisiana. She had left Muskogee at approximately noon on July 1, 1982. At the time the river was running "hot." The outflow below Lock and Dam 14, a few miles upstream from the point of allision, was measured by the Corps of Engineers as follows:

| | |
|---|---|
| July 1, 1982 | 112,015 |
| July 2, 1982 | 112,560 |
| July 3, 1982 | 108,180 |
| July 4, 1982 | 92,641 |

Several witnesses testified that with a flow of that magnitude, the river would be considered to be "hot," and at least some of the witnesses testified that it was as high as they had seen it. However, the court notes that the measurements contained in Plaintiff's Exhibits 2 and 11 show that substantially greater flows had occurred the previous month, ranging upwards to in excess of 164,000 cfs.

At 2300 hours (11:00 p.m.) on July 1, 1982, the MELISSA L, under the command of Captain Murray Curry, "tied off" at the mooring cells above Lock and Dam 14 near river mile 325. Captain Curry decided to tie up at the mooring cells and wait until morning to navigate Lock 14 because of the high water and because a barge was hung in the dam of Lock 14, causing the gates to be wide open. The navigation problems caused by this combination of circumstances caused Captain Curry to desire to spend the night above the lock and dam, and to negotiate it during daylight hours.

In approaching the mooring cells in preparation to "tying off" Captain Curry directed the engineer to put the engines in "overload" to give more power. He did this for 1.7 miles, according to his testimony, before reaching the mooring cells, and the MELISSA L had not stopped. In an attempt to stop, lines were attached to the M/V MARION HAGGERSTAFF which was tied up to the mooring cells with two barges in tow. The MARION HAGGERSTAFF broke loose, and the two boats, using their engines together, were able to back up to the mooring cells and tie up.

At approximately 9:00 a.m. on July 3, 1982, the MELISSA L began its voyage downriver after successfully negotiating Lock and Dam 14 with the help of a small tug which was used primarily to prevent the head of the tow from drifting outward because of the outflow caused by the barge stuck at the dam. There is a great deal of dispute in the testimony about whether Captain Curry and his successor, Captain Jack Bartlett, "got underway" as a result of their own decisions, or were pressured to do so by management. Those conflicts will be discussed in more detail below.

At Lock 14, at approximately 10:30 a.m. on July 3, 1985, Captain Curry left the boat "on his days off" to catch a plane. There was to be a crew change at Lock and Dam 13. At the time, Captain Jack Bartlett, with 35 years experience on navigable waterways, and 25 years as a pilot, was left in command. Before departing, Captain Curry was asked by management if he was confident that Captain Bartlett could handle the tow in view of the conditions, and

he stated that he could. All who testified with knowledge seem to agree that Jack Bartlett was an excellent captain.

After leaving Lock and Dam 14, the MELISSA L proceeded at just above current speed, estimated to be six to seven miles per hour. Somewhere upstream from where Lee Creek enters the Arkansas River (see Chart No. 25 of Plaintiff's Ex. 10), in the bend of the river, the MELISSA L slowed to allow a pleasure boat, the M/V BETTY B–2 to pass. The MELISSA L then continued to travel downriver at current speed toward the Burlington Northern bridge, a distance of approximately 21 miles. At the time, the vessel was being operated at the minimum speed possible to maintain sufficient steerageway, but, according to the testimony, because of the conditions at the time, it would still take from eight to twenty minutes for the MELISSA L to stop her tow.

Bartlett had been through this area several times and was well familiar with it. He observed the lift span of the bridge when he was approximately two miles away, and at the time he saw that the span was open. As will be discussed below, Bartlett's testimony is in hopeless conflict about what happened from this point on. It is obvious to the court that, for reasons to be discussed, apparently caused by a conflict with his employer, he "changed his testimony" from the time he gave a statement to the investigating authorities and gave a deposition in the case, and the date of the trial. In any event, it appears to the court from the conflicting testimony in the case that shortly before the allision, Derrell Davis, the chief engineer of the MELISSA L, joined Captain Bartlett on the bridge of the MELISSA L to observe the negotiation of the lock and dam.

According to Davis, at the time the engines were turned to 835 rpm, producing approximately 3200 horsepower. Davis was seated on a couch behind the wheel, talking with Bartlett. Bartlett had the engine running at that time at 450 rpm, and told Davis that the tow was handling well and that he would continue to run it at that speed.

Shortly after that discussion, Davis noticed that the bridge was beginning to lower, and he told Bartlett. Bartlett apparently observed it at about the same time. Davis estimated that their speed at the time was approximately seven miles per hour. Bartlett immediately jumped up and put the engines to full speed astern. The tug and her tow continued downstream. The barges cleared the bridge, but the tow struck it. When this occurred, the lines holding the barges to the tug parted, and the barges continued downstream, doing the damage stipulated to by the parties.

Donald Skinner, the tender operator for the Corps of Engineers at Sallisaw, Oklahoma, for 14 years, was on the river piloting the pleasure craft, BETTY B–2. It is this boat that had overtaken and passed the MELISSA L at or near the bend of the river between miles 303 and 304. He estimated that the MELISSA L was proceeding at just above current speed, which he estimated to be approximately six miles per hour. He estimated that the speed of the MELISSA L was from six to nine miles per hour as it approached the Burlington Northern bridge. He heard a whistle when he was approximately one-quarter mile away, but did not observe any lights flashing on the bridge. He proceeded under the bridge, as it had not started its descent. After he tied his boat at a restaurant a short distance downriver from the bridge, he saw the developments leading to the accident and the accident. His testimony was that it was like watching something in "slow motion." He saw that the bridge had started its descent, and he did not believe that the tow could stop in time to avoid hitting it. He advised the MELISSA L by radio that the bridge was lowering and heard another radio transmission in which the speaker told Captain Bartlett that he had better "back down," to which Bartlett replied, "I have been backing down for one-half mile. Have someone open the bridge." Skinner then said to Bartlett, via radio, "Skipper, you had better duck."

When Skinner told Captain Bartlett "you better duck;" he estimated that the MELIS-

SA L was approximately one-quarter mile from the bridge and the head of the tow was 100 yards closer. At that time he estimated that the railroad bridge was one-quarter way down. According to his testimony, the collision occurred when the bridge was not "quite all the way down."

Skinner testified that he frequently navigated this portion of the river and that he had had at least one occasion where the bridge had "come down" unannounced in front of the BETTY B-2. He said that this occurred without audible warning and without any evidence of flashing lights. He said he had to "really vibrate" the boat to miss it. In fact, he testified that he didn't ever recall seeing lights flashing on the bridge prior to July 3, 1982.

Leonard Bogoslavsky had lived in the Fort Smith area all his life, and was familiar with the Arkansas River in the area of the bridge. On July 3, 1982, he was on the river in his recreational boat, water skiing with his family. In fact, they had followed the MELISSA L from a point above where Lee Creek empties into the Arkansas, skiing across her wake. He observed the MELISSA L proceeding downbound toward the bridge, following the black buoy line, or middle of the channel. He passed the MELISSA L and was passing her tow when his son directed his attention to the bridge span lowering. He moved over to get out of the way because he knew something was going to happen. At that time, he did not see any lights on the bridge and did not hear any audible warning. In fact, his testimony was (Tr. Vol. III at 10):

Q. At any time prior to that, when you first noticed the bridge coming down, did you hear any sirens or horns coming from the bridge?

A. No.

Q. At the time when you noticed the bridge coming down, did you see any flashing lights on the bridge?

A. No. The lights on the bridge were off.

Q. At the time you noticed the bridge coming down, approximately how far was the head of the tow, the lead barge of the MELISSA L, from the bridge itself?

A. It was very close. It would have been within, I'd say, a hundred and fifty, two hundred, maybe three hundred feet. It might have been at the tow. We had not made it to the head when it started down, but it was very close to the bridge.

. . . .

Q. Now, approximately what period of time elapsed from the time you noticed the bridge start to begin lowering until the time of collision between the MELISSA L and the bridge?

A. It would have been less than three minutes. Two or three minutes. It was practically no time at all.

### THE BRIDGE

The Burlington Northern bridge with which the MELISSA L allided is located at mile 300.8. It was constructed during the mid-1880's and authorized by Act of Congress dated July 3, 1882 (22 Stat. 144). When the McClellan-Kerr navigation project was authorized by the River and Harbor Act of July 24, 1946, the Corps of Engineers undertook to determine the necessary modifications on the Arkansas River to complete the project. Harrington and Cortelyou, consulting engineers in Kansas City, Missouri, were engaged by the Corps to do a design memorandum in connection with the bridge. The design memorandum was completed in March of 1966.

Thereafter, the St. Louis/San Francisco Railroad Company (Frisco), predecessor to the Burlington Northern, was requested by the Corps to redesign and modify the bridge as contemplated by the design memo so as to provide a movable span to accommodate river navigation on the Arkansas, with the cost to be reimbursed by the Corps of Engineers. Harrington and Cortelyou were again retained to redesign the bridge. The design was approved by the Corps of Engineers and the U.S. Coast Guard and a permit was issued on February 6, 1968. The design included the instal-

lation and method of operation of signals, warning lights and the vertical span of the bridge. The bridge was designed, approved and permitted as an unattended and normally open bridge. The bridge was modified pursuant to the plans, specifications and bridge permit and construction was completed in 1970. It was inspected and approved by the Corps of Engineers and the U.S. Coast Guard and was accepted by Frisco. Frisco was reimbursed for its costs of modifying the bridge.

The bridge, as designed and built, is a vertical lift span bridge. The vertical lift portion of the bridge may be raised to allow the passage of watercraft underneath, or lowered to allow the passage of railroad traffic across it. The bridge is normally kept in the raised position, providing a vertical clearance for approximately 58.2 feet above navigation pool when open, 26.7 feet when closed, with a horizontal clearance of approximately 312 feet.

The lift span may be operated by remote control by the Burlington Northern dispatcher located in Springfield, Missouri, approximately 176 miles from Fort Smith-Van Buren. When this procedure is employed, the dispatcher, usually after being contacted by train personnel wishing to use the bridge, codes the bridge to begin its descent cycle. As designed, it is intended that the entry of the descent cycle code activate the bridge's warning horn, warning lights and watercraft detector.

Upon activation of the descent cycle, the warning horn sounds upriver for approximately five seconds and downriver for approximately five seconds. As designed and as operated for some time after it became operational, the warning horns were to sound for 6 minutes 40 seconds prior to the bridge starting its descent, but because of numerous complaints by residents of the area, these changes were made with approval of relevant authorities. At the time that the cycle is activated, warning lights located on the bridge should become illuminated. The warning lights consist of four amber lights, one of such lights being located at each corner of the vertical span. Upon activation of the cycle, the amber lights flash and continue to do so until the span returns to its fully raised position.

The amber lights are union switching lights of the H–2 type with a 10° beam, which means one would have to be within the 10° beam to see it. These lights are direct beam similar to those used on B.N. railroad locomotives. In addition, a navigational light is located on the center of the span which is designed to shine red when the descent cycle has been activated, and designed to shine green during the night-time hours when the span descent has not been activated. A watercraft detector (essentially photoelectric cells) is attached to the vertical span of the bridge. It is designed to detect the approach of watercraft during the bridge's descent. When the "electric eye" detects approaching watercraft, the bridge will not descend, or if descending, it will automatically begin to raise to its fully raised position. The warning period described above lasts for eight minutes from the time the cycle is initiated until the bridge starts its descent. This period was changed from 6 minutes 40 seconds, apparently by B.N. personnel. There was no explanation during the trial for this change. After the warning period, the bridge starts its descent and takes 2 minutes 42 seconds to descend, seat and lock up. When the bridge is locked in the down position, the boat detector is disabled, but flashing amber lights are designed to continue to operate until the bridge is fully raised.

Appropriate signals to train crews are then initiated, authorizing trains to traverse the bridge. A train occupying the bridge track circuit removes all power from the bridge operating machinery, and as soon as a train clears the bridge, power is restored, and after a designed delay of approximately two minutes, the bridge locks are opened, and the bridge raises to a fully up position in approximately 2 minutes 24 seconds. If, after the bridge has descended and locked, no train occupies the track on the bridge for 7 minutes and 20 seconds, the bridge automatically begins its ascent cycle, returning to a fully raised position.

The descent cycle on the span also may be activated manually by either of two methods. One of these methods, activation by a railroad maintenance crew by operating buttons located in a locked box, is not pertinent to this lawsuit, since all parties agree that the train crew using the bridge on the day in question did not have access to the locked "motorman's box," so that method of operation will not be discussed. However, the other method not only is pertinent, but, in the court's view, had as much to do with the causes for this accident as any other factor. The bridge can be lowered by pushing a "trainman's button" located in the trainman's box on the bridge approach approximately 30 to 40 feet from the lift span. Train crews of the MOPAC and B.N. authorized to use the bridge have a key to this locked box, which contains one button marked "Lower." Plaintiff's Exhibit 14 is a photograph of this box. The inside of the door of the box contains instructions to be used by the crews using it. In pertinent part it directs crewmen: "If signal displays stop and there is no conflicting boat movement, push button and hold 4 seconds." The instructions then advise such crew that there will be "a 6 minute 40 second time interval" before the bridge will lower. As indicated above, that was unilaterally changed by the B.N. to eight minutes, but apparently no changes were made in the instructions.

When the descent cycle is initiated by use of the trainman's button, it is not necessary to contact the dispatcher in Springfield. After the button is pushed, the cycle described above begins and is exactly the same with the very important exception that the watercraft detector or "electric eye" is deactivated. In short, the testimony shows that there is no way to stop the descent of the bridge after the button is pushed in the trainman's box irrespective of what happens on the bridge, in Springfield, or on the river.

The trainman's button was designed to be used in any case where the span could not be lowered through the dispatcher's coding, due to fog or other reasons which cause the "electric eye" to prevent the bridge from being operated. However, the testimony shows that, contrary to the original design and direction for use of the trainman's button, on July 3, 1982, and before that date, the custom and practice that existed was to regularly use the trainman's button to operate the bridge. In fact, MOPAC crewman, Hulan Mosley, the MOPAC brakeman who activated the trainman's button on July 3, 1982, testified that of the approximately 14 times that he had used the bridge, it was coded automatically only three or four times and the remainder of the time he operated it by use of the button on the bridge. As will be discussed in more detail below, there appears to be an amazing lack of instruction and understanding of the operation of the system by both the MOPAC and B.N. crews.

The bridge is equipped with a recording device which gave an almost "blow-by-blow" account of this accident. All parties, with the exception of MOPAC, agree that this recording device accurately recorded the events that occurred on the day of the accident, even the moment of impact. The court notes, as will be shown below, that the time sequence shown by the recording device is not favorable to MOPAC's position, which may account for its reluctance to accept the obvious. In any event, the court finds that the recording device accurately recorded the events that occurred. It was designed and operated in such a way that it, in effect, drew a graph of the operation showing exactly what portions of the cycle were operated, and when. The times shown are rounded by the device to the nearest minute. The log reflects the following time sequence at or near the time in question (Tr. 397–403):

| | |
|---|---|
| 12:57 p.m. | Bridge Dispatcher in Springfield "codes" the bridge. The warning lights on the bridge, according to the graph, came on in preparation for the lowering of the bridge. |
| 1:05 p.m. | The bridge span leaves its full upright position and starts its descent. |
| 1:08 p.m. | Bridge span is down and locked. |
| 1:18 p.m. | Because no train had occupied the bridge during the time permitted, the bridge cycles out and begins ascending. |

| | |
|---|---|
| 1:20 p.m. | Bridge span is in fully raised position and warning lights are off. |
| 1:25 p.m. | The trainman's button on the bridge is pushed and the warning lights go on. |
| 1:32 p.m. | Bridge span starts its descent. |
| 1:35 p.m. | Vibrations indicated. All parties except MOPAC seem to agree that this indicates the time that the MELISSA L allided with the bridge. |

Prior to July 3, 1982, there had been complaints and problems directed to Burlington Northern electrical engineer, Robert Ege, in regard to the bridge span descending in front of river traffic. Shortly after June 17, 1982, and prior to June 3, 1982, Ege received a copy of a letter from the Coast Guard enclosing a letter from the Arkansas Waterway Commission. This letter contained complaints about the bridge span closing with river traffic present, described the difficulty in observing any warning lights on bright, clear days and related two specific instances where mariners had experienced near casualties. Among other things, the letter discloses to anyone who read it (and Ege admits that he did) that:

This system is not functioning as designed and this coupled with the sun and high water has created the hazard to navigation.

When a tow is downbound early in the day the bridge lights are difficult if not impossible for the pilot to see when the sun provides the background. With the currents running on the Arkansas River now (in excess of 100,000 cfs) it is almost impossible to stop the tow once the pilot has lined up the tow and started his run for the bridge navigation span from the mooring cells just above the bridge.

The letter after further discussing what the writer believes to be the hazards to navigation caused by the bridge, concludes "urgently requesting that the Coast Guard look into this matter immediately and in turn make the needed physical and operational changes that are required to prevent or lessen the possibility of an accident at the bridge site." (SFI Ex. 4) Apparently no action was taken in relation to the problems raised in the letter, either by the Coast Guard or by the Burlington Northern Railroad.

### The MOPAC Train And Its Crew

At approximately 12:45 p.m. on July 2, 1982, the heavily loaded MOPAC train desired to cross the Burlington bridge from Van Buren to Fort Smith. When the train arrived at the Burlington track, brakeman Hulen Mosley called the Burlington dispatcher in Springfield to obtain clearance to get on the Burlington line and also to receive the proper signal to approach the bridge. As reflected by the chart described above, the bridge was coded to descend at 12:57 p.m., and did descend, but the train crew could not get the train to climb the upgrade to the bridge because of a lack of traction and its heavy load. The train was not able to make the approach until approximately 1:20, during which time the bridge had completed a full cycle beginning at 12:57 p.m. and returning to the "up" position at 1:20 p.m. Without recontacting the Burlington dispatcher, Mosley opened the trainman's box and followed the instructions contained in it. He claims that he first looked and saw no river traffic approaching the bridge, and he then pushed the button. He estimated that he could see upriver to a point at least to the Bekaert Steel Plant which he estimated to be a distance of some two and one-half miles. Witnesses did not fix the exact location of this steel plant on the chart (Plaintiff's Ex. 10), but all seem to agree that it was located upstream from the point where Lee Creek flows into the Arkansas. So the distance that Mosley should have been able to see the 1,000 feet of boat and barges was in excess of two miles and, in fact, his estimate of two and one-half miles appears to be reasonably accurate. He testified that if the MELISSA L had been there, there was no reason that he should not have been able to see it, since the day was clear, and his view was unobstructed.

After pushing the button, he waited for the bridge to descend. Because he thought, as the instructions indicated, that the warning period was 6 minutes 40 seconds, he became concerned when it did not

start down when he thought it should according to the instructions. Then, at approximately eight minutes after he initiated the cycle, the bridge started its descent. According to his testimony, when the bridge was about halfway between its raised position and its seated and locked position, he noticed, for the first time, the tug and its tow. At that time he estimated that the lead barge was from 300 to 500 feet away.

At the time he had received no instruction on the operation of the bridge, and didn't know whether the boat detector would work or not. He testified that he didn't know what to do. He tried to get in the motorman's box which was to be used by maintenance crews, but because he did not have a key to the lock on the box, he was not able to do so. Because there was only the button which started the descent in the trainman's box, he was not able to take any action to prevent the accident that he knew, at that point, was certain to occur.

Steven Peters, the MOPAC engineer, was riding on the right-hand side of the engine, long nose forward. He had a clear view up the river and looked and saw only a stationary sand barge. He testified that he had a clear view to the curve in the river and the MELISSA L was simply not there at the time that the button was pushed. He testified that he knew that the boat detector was disabled when the bridge was operated from the trainman's box and that he did not discuss it with his crew because he thought that they knew it also. However, he testified that he had seen the bridge, after being operated by the trainman's button, descend when the beam of the boat detector was broken.

### Negligence Of The Boat People

Before discussing this aspect of the case, the court feels compelled to discuss the credibility of two very important witnesses in this case. Captain Murray Curry had been in command of the tow until shortly before the accident, and at the time of the accident Captain Jack Bartlett was in charge. By the time of the trial neither of these individuals continued to work for the

owner and operator of the MELISSA L. There is evidence to show that neither of these witnesses are particularly "friendly" with their former employer, for various reasons. This is especially true in the case of Bartlett who, as the court pointed out during questioning at the trial, undoubtedly and unquestionably changed his testimony from the time that the accident happened to the date of the trial in very material respects. For example, his trial testimony and his testimony at a pretrial deposition and his statement given to the investigating body is totally contradictory on the crucial issue of when he first observed the bridge span descending. At the trial his testimony was that the head of the tow was approximately one and one-half miles from the bridge when he received a call from another vessel advising him that the span was lowering, at which time he immediately began backing. He testified at the trial that the impact occurred three or four minutes later. However, his deposition testimony reveals that he continually testified that when he first observed the bridge descending after receiving the call, the head of his tow was approximately 300 feet from the span and by the time the engines got into reverse position and the vessel started coming astern, the head of the tow was under the bridge. Further, Captain Curry admitted during the trial that the first time that he talked to Bartlett about the accident, Bartlett told him that he did not become aware that the bridge was coming down until his tow was entering the bridge and that he began backing full astern when he learned this.

In addition, a certified copy of the contents of the United States Coast Guard Marine Safety Office Casualty Investigation file in relation to this accident was offered and received in evidence as SFI Exhibit 2. There was an objection to the receipt of that evidence, but the court then believed, and now finds that it was admissible at least for impeachment purposes, and the court will consider it only for that purpose. In any event, that exhibit contains the transcript of a recorded statement which Bartlett gave to the investigating

officer on July 7, 1982, a mere four days after the accident. That statement reflects that Bartlett told the investigating officer at that time that the head of his tow was approximately 300 feet from the bridge when he learned that the span was lowering, and that by the time the vessel began going astern, the head of the tow was inside the span.

Because the court believed at the time of the trial that this drastic and important change in testimony raised serious questions of credibility, the court asked Bartlett the reasons for such change, and he failed, in the court's view, to adequately explain it.

Perhaps the change in testimony can be explained by other testimony in the case. Paul Gros, a port engineer for System Fuels, testified that in May of 1984 he received a phone call from Jack Bartlett. In that phone conversation, Bartlett told him that he was losing money because he was out of a job and that he believed that this was because his former employer had "blackballed him." He said that he was about to lose his house, and that if System Fuels didn't come up with $42,000.00 "he was going to muddy the water in the court case." He had him repeat the statement and wrote it down. The writing that he made was introduced as SFI Exhibit 8.

At the trial, Bartlett admitted that he had made such a call and that he had blamed General Marine for his inability to find work, believing that they had, indeed, blackballed him. He admitted that he did tell Gros that the company had to come up with some money to keep him from losing his house, and seemed to admit that he told him he would have to "intervene" in this lawsuit. In fact, it appears that the only difference between his version and that of Gros is that he denies that he said he would "muddy the water."

In any event, and for whatever reason, it is obvious that Bartlett's version of the accident and the matters leading to it was so vastly different at the trial than at times much closer to the incident, and the court must conclude that Bartlett's trial testimony is of little value to the court in attempting to determine what happened on the day of the accident.

While the testimony of Captain Curry is, by no means, of the same nature as that of Jack Bartlett, it did become evident during the trial that, for whatever reason, Captain Curry was not as "helpful" to his former employer as he was at the time that he was employed by it. He testified at the trial that neither he nor Jack Bartlett wanted to leave the mooring cells to which they were tied above Lock 14 on July 3, but that they were pressured to do so by James Nowell, president of General Marine. However, contrary to this testimony, he agreed at the trial that in a deposition given in September of 1983 he testified that, in effect, a river at the stage of the Arkansas on that day "... wouldn't be a hot river. You might give it a little respect, but nothing you would have to worry about." When this was called to his attention at the trial and he was asked whether he agreed with that statement, he said "I have to. I made it."

It appears from the testimony that not only did Captain Curry not believe at the time that the river was particularly "hot," he left the boat one stop early with Bartlett in charge, and seemed to have no concern about doing so. There was testimony, including testimony of Bartlett and Curry, that the decision on whether a boat "goes" is the captain's to make. The court believes and concludes that Curry and Bartlett, with over 40 years piloting experience, chose to proceed and did not believe at the time that the river or the handling of the boat was of particular concern.

In short, the court believes and finds that, for whatever reason, Jack Bartlett, and to a lesser extent, Murray Curry, by the time of the trial had changed their testimony in substantial and important ways raising serious credibility questions.

The other parties contend that the MELISSA L crew was negligent in several ways. They contend that, in the first place, the MELISSA L's crew was presumptively at fault under the applicable law, *citing Woods v. United States*, 681

F.2d 988 (5th Cir.1982); *Bunge Corp. v. M/V FURNESS*, 558 F.2d 790, 794–95 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978); *American Commercial Lines, Inc. v. Valley Line Co.*, 529 F.2d 921, 924 (8th Cir.1976); *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F.Supp. 824, 832 (E.D. La.1981), *aff'd*, 699 F.2d 240 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 82, 78 L.Ed.2d 92 (1984); *Claim of Gypsum Carrier*, 465 F.Supp. 1050, 1062 (S.D.Ga. 1979).

█ It is true that these cases hold, and the law is that when a vessel traversing navigable waterways hits a fixed object, it is presumptively at fault. That is, of course, based on simple logic and normally would be true, just as it is true that a pedestrian who walks into the side of a building would presumptively not be totally blameless, since the building didn't do anything wrong. It just sat there. On the other hand, if the building was suddenly dropped in front of a pedestrian, that presumption of fault would not apply.

█ As will be discussed below, the court is convinced that the movable bridge span was lowered in front of the MELISSA L when it was dangerously close and, in fact, according to the testimony, was not down and locked and was thus presumably still moving when the impact occurred. Under these circumstances, the presumption of fault dictated by cases such as those cited above does not apply. *United States v. Sabine Towing and Transportation Co.*, 289 F.Supp. 250, 252 (E.D.La.1968).

The other contentions by the opposing parties in relation to the alleged negligence of the Boat People are so intertwined that the court will discuss them together. Specifically, it is argued that the boat crew was negligent in not keeping and maintaining a proper lookout; that the river conditions were such that the boat should not have left Lock 14 until the river flow subsided; and that the condition of the boat, and specifically the propellers, was such that the boat could not be stopped in a reasonable time and could not be handled properly. The court believes that the acci-

dent in this case was caused by more than enough negligence to "go around," but, in the court's view, the most difficult part of this case is whether any of the blame should be placed upon the Boat People. The court is convinced that the "facts" show that the bridge was lowered when the MELISSA L was dangerously close and was, perhaps, so close that it was impossible for her to stop. On the other hand, the court is equally convinced that the boat at the time was in violation of a regulation promulgated by the Secretary of the Army pursuant to the provisions of Section 7 of the River and Harbor Act of August 8, 1917 (40 Stat. 266; 33 U.S.C. § 1). That rule is found at 33 CFR 207.25(e)(3)(iii) and was available to the boat captains using the Arkansas River at Sheet K of the Navigation Charts for the river introduced as Plaintiff's Exhibit 10, and available to the captains of the MELISSA L. In pertinent part, that rule provides:

> Within the last mile of approach to unattended, normally open automatic, movable span bridges, the factors of riverflow velocity, of vessel (and tow) velocity, and of vessel power and crew capability are never to be permitted to result in a condition whereby the movement of vessel (and tow) cannot be completely halted or reversed within a 3-minute period.

There is no question but that, according to the evidence, the MELISSA L could not stop in three minutes, or any time close to that. The shortest time estimated by any of the knowledgeable witnesses was that of Derrell Davis, the engineer for the MELISSA L who testified that, based upon the conditions on the river that day, and with the engines "turned up" as high as they could be without the danger of "blowing them," he estimated that the MELISSA L could be stopped within one-half mile which would take, in his estimation, eight to ten minutes. Jack Bartlett, whose credibility is questionable, as the court has already pointed out, testified that it would take 20 minutes to stop "with those wheels." Captain Curry says that he estimated that it would have taken, considering the conditions that day, 15 to 20 minutes of backing

to stop the tow. He also testified that he did not believe that there was a boat on the river that could stop in three minutes with a 7-mile current. In fact, he didn't think it could be done when the current was three to four miles per hour. Be that as it may, the regulation cited above was in full force and effect on the river on the date of the accident and was unquestionably violated.

■ Where does that leave us in respect to the negligence of the Boat People? Over a century ago the United States Supreme Court spoke on this question and developed what has become known as "The Rule of the Pennsylvania." In the case of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), the Court held that, when a vessel is guilty of statutory fault, it can escape liability only by showing that the violation *could not possibly* have contributed to the accident. (Emphasis supplied.) "Statutory fault includes failure to obey any rule, statute, or administrative regulation promulgated pursuant to the agency's statutory authority," which is designed to eliminate collision or facilitate navigation. *Belden v. Chase*, 150 U.S. 674, 698, 14 S.Ct. 264, 271, 37 L.Ed. 1218 (1893), and *Hogge v. SS YORKMAR*, 434 F.Supp. 715 (1977).

The rule of *The Pennsylvania* unquestionably places a heavy burden on the operators of the boat. However, as the court said in *Allied Chemical Corp. v. Hess Tank Ship Co. of Delaware*, 661 F.2d 1044, 1052 (5th Cir.1981):

■ Although neither we nor the District Court can ever know exactly what happened that morning, the rule of *The Pennsylvania*, 88 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), requires *Socrates* to provide that its failure to sound fog signals could not possibly have contributed to the accident. That time-honored rule places a heavy burden of proof upon the party attempting to refute fault.

The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

88 U.S. (19 Wall.) at 136. This rule still floats, in the wake of *U.S. v. Reliable Transfer* [421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)] *supra*, which only overruled *The Pennsylvania* on the point of allocating comparative fault. *See Atlantic Mutual Insurance Co. v. ABC Insurance Co.*, 645 F.2d 528, 531 n. 9 (5th Cir.1981).

It may be, as the Boat People argue, that no boat on the river could comply with the regulation. However, that does not mean that the court can disregard the law. That argument should be made to the regulators in an attempt to get the regulation changed, not to the court in an attempt to get the court to ignore the law. A similar contention was made in the *Hogge* case, *supra*, and was answered, at 735, as follows:

The *YORKMAR* argues that six knots through the water was the absolute minimum speed at which she could maintain adequate steerage in the narrow Canal and that, therefore, her speed was "moderate." Some cases have accepted this argument, particularly in circumstances where a narrow channel and a long vessel make good steerage way an absolute necessity. *See, e.g., Hess Shipping Corporation v. The SS CHARLES LYKES*, 417 F.2d 346 (5th Cir.1969), *rehearing den.*, 424 F.2d 633 [1970], *cert. den.*, 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 91, *rehearing den.*, 400 U.S. 931, 92 S.Ct. 184, 27 L.Ed.2d 191. The weight of authority, and better reasoned theory, however, appear to be opposed. *See, e.g., Anglo-Saxon Petroleum Co. v. United States*, 224 F.2d 86 (2d Cir.1955); *Barrois Bros., Inc. v. Lake Tankers Corporation*, 188 F.Supp. 300 (E.D.La.), *aff'd per curiam*, 286 F.2d 573 (5th Cir.1961). *Griffin on Collision* § 124 (1949). These authorities hold that if a vessel's

minimum steerage speed is greater than that which would permit a complete stop within the limits of visibility, her obligation is not to be under way. Justice Strong in the *Pennsylvania*, 86 U.S. (19 Wall.) 125, 134, 22 L.Ed. 148 (1873), explained the view as follows:

> And even if it were true that such a rate (seven knots) was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great. It would rather have been her duty to lay to.

In short, there is little question but that, according to the rule of *The Pennsylvania*, which is still the law, the MELISSA L can escape liability only by showing "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Has that admittedly heavy burden been met in this case?

In their brief, at p. 20, the attorneys for the MELISSA L agree that it "could not have stopped within 3 minutes on July 3, 1982, irregardless [sic] of the type of wheel," but contend that they have met the burden of showing that that could not possibly have had anything to do with this accident. The basis for this contention is that they believe that the physical evidence shows that the bridge started its descent no more than 2 minutes 42 seconds before the collision, thus, even if the MELISSA L had been able to stop in three minutes, it would not have avoided the allision. As a preface to this contention, the attorneys for the MELISSA L argue that the evidence shows that the warning lights were not adequate and that there was no evidence to show that the crew of the MELISSA L should have become aware of the bridge descending before the actual descent began.

The court agrees that the warning lights were not adequate. The testimony was that no one on the river, including disinterested witnesses, saw them on that day and, in fact, Donald Skinner, who frequently used the river, did not recall ever seeing them. SFI Exhibit 4 shows that this deficiency in the system had been present for some time, presumably since installation, and that the problem had been called to the attention of a responsible official of the Burlington Northern, with no result. Thus, the court concludes that the captain of the MELISSA L on the fateful day was not negligent in not discovering that the bridge was about to lower before it actually began its descent.

The basis of the contention by the MELISSA L that the bridge started its descent no more than 2 minutes 42 seconds prior to impact is that the testimony shows that the contact occurred when the bridge had not quite completed its descent and was locked. The testimony was that that should have taken 2 minutes 42 seconds. That contention has a certain technical appeal, but the evidence indicates that the bridge did not always operate exactly as designed. Certainly, the court cannot say that the captain did not or could not have observed the descent of the bridge three minutes or more before the collision. In fact, his statement to a radio caller that he had been backing for one-half mile refutes this contention. Assuming he was traveling at somewhere near seven to eight miles an hour, he presumably backed for more than three minutes, if his statement is correct. In short, the court simply cannot find, based on the timing chart and the design times of the cycle, that the MELISSA L has met its burden of proving "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Carried to its logical conclusion, and if we can be that exact in this case (which we cannot), this would mean that the towboat, if it met the regulation, would have been almost stopped when it hit the bridge. In another 18 seconds it would have been completely stopped. Thus the court cannot say that violation of the rule did not contribute to the accident, or at least to the damages which ensued. If the MELISSA L had been slowed to within 18 seconds of stopping at the time it hit the bridge, it can

be argued, with logic, that little if any damages would have resulted from the allision.

In addition, there is evidence which indicates that Captain Bartlett was not as careful as he should have been, under the circumstances. The testimony indicates that, immediately before observing the descent of the bridge start, he had been seated on a couch talking to Engineer Derrell Davis. The evidence is that he had not viewed the bridge with binoculars, but that he had seen the train and its crew standing on the approaches to the bridge. In spite of that, he took no action to attempt to determine what they were doing there and did not slacken his speed. Captain Curry testified that he thought it would be "good practice" to slacken speed or go in reverse and at least carefully view the bridge if, on approach to it, it was noted that a train and its crew had occupied the approaches to the bridge.

In summary, the court finds that, on the day in question, the MELISSA L could not be stopped in three minutes and, thus, that the rule cited above was violated. The court also finds that the MELISSA L and its owner and operator have not met their burden of showing that the violation of this regulation "could not have been" a contributing cause of the accident. However, the court believes that the evidence does show that this is an extremely close question, and that the railroad bridge was lowered by the MOPAC crew when the tug and her tow had to have been in sight for several minutes, and that the bridge began its descent when the tow was almost to the point of being unable to avoid the accident, irrespective of whether the rule had been violated. For this reason, the court finds that the negligence of the MELISSA L crew was minimal, when compared to that of the other "actors" in this drama. A comparison of the negligence of the parties will be made below.

### Negligence Of The MOPAC Crew

■ The Missouri Pacific Railroad Company, and its attorneys, seem to contend that its crew did no more than follow certain general orders, rules, regulations, timetables, etc., and, thus, cannot be liable for unquestionably lowering the bridge in front of the MELISSA L. In this respect, the court was at least surprised by the tack that witnesses for both of the railroads took. It seems to the court that they are "so bound up" by rules, regulations, general orders, and other red tape that they could not, in this case, "see the forest for the trees." Rick Schreiber, a MOPAC witness, who was, at the time of trial, supervisor of trains, and was trainmaster at Van Buren at the time of the accident, gave the court the impression that he believed that he and the people working for him had to follow the rules and regulations of the railroad even if their application under the situation at hand was unwise and even stupid. He seemed to think that as long as that was done, the railroad employees had carried out their duty and that they could do nothing else.

This approach seems to be echoed by the brief of the MOPAC which spends many pages discussing the rules and regulations of the B.N. and the MOPAC under which they were operating on the day of the accident. With all due respect, the court does not believe that it makes one whit of difference what the regulations were, or that the crew was following the regulations if a reasonably prudent person would not have done so under the circumstances that existed at the time.

Irrespective of what the rules were, and which rules applied on the day of this accident, the fact is that the Missouri Pacific train crew approached the bridge to cross it at some time around 12:45 p.m. on the date of the accident. The B.N. dispatcher in Springfield was called to code the bridge, and he did. The bridge started its cycle at approximately 12:57 p.m. and was down and locked by 1:08 p.m. It stayed down for ten minutes and, because the heavily loaded train could not get up the approach to the bridge, it automatically cycled back up as it was designed to do.

Then, rather than call the dispatcher, the trainman's button was used to start the cycle again. It is obvious from the testimo-

ny that there was a woeful lack of training and understanding of the operation of the bridge. It is not at all clear what Hulen Mosley thinks he believed about the operation of the boat detectors when the trainman's button was used. At one point he says that he knew that the boat detectors were disabled, but at another point his testimony makes it apparent that he was not clear about this. There is other testimony which indicates, to say the least, a lot of confusion among all of the railroad personnel about how the system was designed to work, and it is apparent that little, if any, effort had been made to train the personnel about the operation of the bridge. Mosley had received no training other than word of mouth from other crew members, and, as indicated, he obviously wasn't sure about the operation.

Both of the members of the train crew who testified (Mosley and Peters) agreed that they had a clear view of the river up to the curve at or above Bekaert Steel. They agreed, and the evidence shows, that this view was at least two and one-half miles. Yet, both of them testified that they looked and did not see the MELISSA L before the button was pushed. In fact, it appears that they did not believe that the MELISSA L was there and apparently think that it in some magical way popped up on the river, almost to the bridge, at a point when the bridge, according to Mr. Mosley's testimony, had descended to the half-way point. However, the irrefutable physical evidence is that the barge and its tow consisting of over three football fields in length had to have been in sight for many minutes prior to the collision. The attorneys for the MOPAC argue in their brief that the court should pay little, if any, attention to the times involved at the timing chart because of what they believe to be uncertainties about this. Obviously, in the court's view, the reason that this position is taken is that the MOPAC recognizes that these "facts" do not inure to their benefit. The fact is that no one present estimated that the MELISSA L was traveling in excess of seven or eight miles an hour as it proceeded downriver. By the irrefutable laws of physics, an object traveling at seven miles

per hour takes 8.5 minutes to traverse one mile. One traveling ten miles per hour takes six minutes. Thus, the MELISSA L should have been in view for a period of in excess of 21 minutes if traveling at seven miles an hour, and for 15 minutes if it was traveling at the relatively swift speed for a rig such as this of ten miles per hour. Unquestionably, in the court's view, the MOPAC crew was negligent in starting the irreversible bridge lowering cycle without first determining that the 1,000-foot long, 10,000 ton MELISSA L and her tow was bearing down upon them. There is, in the court's view, no excuse for Mosley and Peters not to have seen the MELISSA L, and thus, they were negligent. If they did see it, but still started the lowering cycle, they are obviously negligent. In the court's view, the MOPAC negligence contributing to this accident is substantial. A comparison will be made below.

### Burlington Northern Negligence

■ The court believes that the evidence shows that the B.N. personnel were negligent in several respects. In the first place, the bridge was, in the court's view, clearly negligently designed, maintained and operated. In addition, it is clear that the B.N. personnel did little, if anything, to make certain that their crews and the crews of the MOPAC using the bridge frequently (in fact more than the B.N. did) were knowledgeable about the operation of the bridge, and specifically the boat detectors.

The B.N. apparently contends that it can have no fault in respect to the design and operation of the bridge irrespective of how negligently it is designed or how negligently operated, so long as the design and operation was approved by the Coast Guard, Corps of Engineers, etc. At the trial, the court indicated that it "could not believe that that was the law," and after giving the matter further consideration and researching the law to the extent possible, the court is convinced that it is not. That argument was made and rejected in *Hogge, supra,* at 729, as follows:

The Bridge Company argued that it had complied with all the warning device re-

quirements issued by the War Department and so should not be held liable. The court rejected this argument and held that the bridge's duty of care was not exhausted by the compliance with the applicable regulations. Similar arguments were made in *Circle Line Sightseeing Yachts, Inc. v. City of New York*, 283 F.2d 811 (2d Cir.1960), and *Contino v. Baltimore & Annapolis Railroad Co.*, 178 F.2d 521 (4th Cir.1949). The general proposition which can be derived from the cases is that a private party with custody of a hazardous instrumentality cannot be heard to say that its duty to use due care in the operation of the instrumentality and the use of warning devices is exhausted merely because it has complied with all applicable laws and regulations. Nor can it completely delegate its duties to some government agency with jurisdiction over or responsibility for, the instrumentality.

The court is totally convinced that the evidence shows that the bridge operation was negligently designed, no matter by whom designed or by whom authorized and approved. The fact is that the bridge was designed and operated in such a way as to allow an untrained crew member to start, irrevocably, the descent of the bridge, with no opportunity to "change his mind." After the button was once pushed, there was a span of almost 20 minutes when no one had the slightest bit of control over the bridge, irrespective of what happened on the river or on the approach to the bridge. When the button was pushed, there was an 8-minute warning cycle (unilaterally changed by the B.N. from 6 minutes 40 seconds with no explanation) which, according to the testimony, was almost useless. Horns sounded up and down the river for a total of ten seconds, a time totally inadequate to warn a boat that was any substantial distance away at the time. Then, lights which, according to the evidence, were inadequate, flashed, allegedly to give warning of the impending inexorable descent of the bridge. On the date of the accident, no one saw them, at least on the upriver side, and, as indicated above, there was evidence that this had been a problem for a great

period of time, and had been called to the attention of Robert W. Ege, who was, at the time of the accident, an electrical engineer with the B.N. responsible for the territory in which the bridge was located. Mr. Ege was asked if he or any other responsible B.N. representative had ever attempted to determine how far upriver the flashing amber lights could be seen by approaching vessels. Incredibly, he answered: "Not to my knowledge. That wasn't the Burlington Northern's responsibility." It wasn't clear whose responsibility Mr. Ege thought the safe operation of the bridge was, but it was clear that, apparently also because of rules, regulations, and other red tape, it wasn't his or his railroad's.

In any event, after the button is pushed in the trainman's box, a largely useless 8-minute warning cycle was initiated. Then, the bridge started its descent which took 2 minutes 40 seconds. After that, a train had approximately seven minutes to occupy the track. If it did not do so, the bridge began ascending, taking 2 minutes 24 seconds to get to the fully raised position. Thus, it is clear from the evidence that, from the time the button was pushed, there were 20 minutes when no one, not even the B.N. dispatcher in Springfield, had any control over the bridge.

This means that based on the lighting and warning horn conditions already described above, a boat traveling seven miles per hour, barely the river current speed on that date, could be a mile and a half away or approximately where Lee Creek flows into the Arkansas and not be aware that the bridge had started its descent until it was one-half mile or less from the bridge, an obviously dangerous situation.

Almost incredibly, the design did not employ any means by which an operator who discovered he had made a mistake could do anything about it. In this case, the evidence is that Mosley discovered the boat and realized that an accident was likely to occur when the bridge span was approximately halfway down. The evidence is that he ran around the bridge trying to get into

other boxes, not knowing what he would find, but the evidence clearly shows that he had no options other than the one that he employed—that is, do nothing. By simply pushing the one button located in the trainman's box, he started a sequence of events that, as one witness described it, caused an accident to develop "in slow motion," and he was not provided with the means to do anything about it.

The motorman's box to which the train crew did not have access did have two buttons, an up button and a down button. In other words, a member of the maintenance crew who realized that he had made a mistake could "change his mind" and undo what he had done. A person operating the bridge by the trainman's button did not have that choice. Ege testified that an up button could have been provided in the trainman's box, but seemed to take the position that the railroad had no obligation to do so since the design had been done by someone else and had been approved by the relevant government authorities. Mr. Ege also testified that, as far as he knew, after this irrevocable series of events had been begun by pushing the button, no one, not even the dispatcher in Springfield, could stop the sequence of events. The court believes that this is clearly negligence, and was a substantial cause of the accident.

In addition, the record is replete with deficiencies in the instruction and training that the B.N. gave its crews and the crews of the MOPAC. Few of the witnesses, with the possible exception of Mr. Ege, were really certain about how the bridge was designed to operate and, in fact, Mr. Ege had some uncertainty about this. As indicated above, he testified that he believed that the dispatcher in Springfield could not stop the descent of the bridge after it had been started from the trainman's box, but he did not appear to be sure of this.

In addition, as already discussed, the warning system was clearly, in the court's view, inadequate and the B.N., and specifically Mr. Ege, were or should have been fully aware of this. During his testimony, Ege admitted that a number of instances where near accidents were alleged had

been called to his attention prior to July 3, 1982, and that he was aware that there were complaints about the visibility of the warning lights and the adequacy of the audible signal, but nothing was done about it. The letter from the Arkansas Waterways Commission received as SFI Exhibit 4 graphically described the system deficiencies and prophetically warned that lighting changes should be made and bridge operational procedures modified "in order to prevent an accident which could be catastrophic." Apparently, according to Ege's testimony, little if anything was done about this and other warnings apparently because he didn't believe it was his or the railroad's problem. He does not believe that anything was done in writing in relation to complaints about previous near collisions, and that there may have been, at most, some verbal directions to crews that they should be more careful in the operation of the bridge. This was clearly an inadequate response under the circumstances and considering the dangers involved.

**Comparison of Negligence**

In the case of *United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Supreme Court changed the admiralty rule of divided damages whereby the property damage in a maritime collision is equally divided whenever two or more parties involved are found to be guilty of contributory fault, regardless of the relative degree of their fault. to the proportional liability rule requiring liability for such damage to be allocated among the parties proportionately to the comparative degree of their fault. As indicated above, while the court believes and admits that it is a very close question, it cannot find that the MELISSA L and its owners and operators have met the burden imposed by the rule of *The Pennsylvania*. However, when compared to the clear fault of the MOPAC and the B.N., the court believes that the fault of this party is minimal.

On the other hand, as discussed above, the MOPAC crew and the B.N. personnel were, in the court's view, obviously negli-

gent, and their combined negligence was the primary cause of the accident.

Based on the evidence discussed above, the court has concluded that the negligence of the MOPAC crew, when combined with that of the negligence of the personnel of the B.N., represents ninety percent (90%) of the total fault proximately causing the accident. The court cannot say that the negligence of the MOPAC crew in lowering the bridge at a time when the MELISSA L was plainly in sight is any greater or any less in degree than that of the B.N. officials who allowed the situation described above to exist. Thus, the court, pursuant to the provisions of the *Reliable Transfer* case, *supra,* apportions the liability ten percent (10%) to the MELISSA L and her owner and operator, forty-five percent (45%) to the Burlington Northern Railroad Company, and forty-five percent (45%) to the Missouri Pacific Railroad Company.

The attorneys for the parties are directed to submit to the court, within fourteen (14) days of the date of this opinion, an agreed judgment in compliance with the court's decision set forth above. If the attorneys for the parties cannot agree to a judgment within such time, the court shall be advised, within such period, in writing, of the attempts to do so and the contentions of the parties in respect to it.

Both of the original plaintiffs, Cummins and APAC, have contended that the court should award attorneys' fees in this case, citing cases such as *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *E.I. DuPont De Nemours & Co. v. Riverway,* 639 F.2d 404 (8th Cir.1981); and *Inland Tugs Company v. The Ohio River Company,* 709 F.2d 1065 (6th Cir.1983). The court simply does not believe that the factors necessary for the court to award attorneys' fees are present in this case, and the request will be denied.